**SAN FRANCISCO SHOPPING NEWS CO. v. CITY OF SOUTH SAN FRANCISCO et al.**

**No. 7125.**

Circuit Court of Appeals, Ninth Circuit.

March 19, 1934.

880

Thomas C. Ryan and Sloss & Turner, both of San Francisco, Cal., for appellant.

J. W. Coleberd, of South San Francisco, Cal., and John A. McGilvray, of Sacramento, Cal., for appellees.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

Since the present appeal is from a decree dismissing the appellant's amended bill in equity, on motion of the appellees, we shall set forth in some detail the allegations of the bill. While it is true that, for the purpose of this case, all well-pleaded allegations of the bill are to be taken as true, as we proceed in our examination of that document we will point out certain averments that, in our opinion, are not statements of facts, but mere conclusions. As will be seen, however, our views as to such averments have not been controlling in our determination of the case.

Alleging that the jurisdiction of the court below was invoked because of the federal question involved, the appellant's amended bill in equity sets forth that the appellant is the owner and publisher of "San Francisco Shopping News," which it describes as "a newspaper," giving its dimensions; and that the publication is distributed regularly twice each week throughout the year in the city of South San Francisco, Cal., "only to those * * * who have specially requested" such delivery.

The details of the delivery are then elaborated. The bill avers that the publication is delivered "by boys who are trained and regularly organized as carriers thereof and are competent for that purpose, and who are instructed to deliver and do deliver copies of said San Francisco Shopping News by attaching them to knobs of doors or by leaving

them on porches of houses, and not otherwise"; that "the carriers are instructed, strictly, not to leave, and they do not and will not leave, said paper at a place where the same is not desired by the occupant thereof, or upon the porches or knobs of doors or about the premises of vacant buildings, or at a building whose appearance indicates that the occupant is away from home."

Here we may pause to observe that the pleader does not intimate by what means its carriers arrive at the *conclusion* that a given house "indicates" that it is vacant. Common experience suggests that it is frequently extremely difficult to tell by the exterior of a house whether or not it is occupied. As we shall see presently, the city council of South San Francisco might reasonably have arrived at the conclusion that it is impossible, either as a general rule or under special local conditions, to determine, for practical purposes, whether or not a particular building is tenanted.

Continuing our examination of the bill, we are informed that the carriers are instructed, also strictly, "not to deliver, and they do not and will not deliver," a copy of the publication "to a place where said paper is not *regularly* taken up by tenant thereof; that, in case a paper of any sort should remain at a place without being taken in, said carriers are instructed, strictly, not to deliver," etc., a copy of the publication at such place; "that deliveries of said paper are *regularly* followed up by competent men in the employ of plaintiff [appellant], as inspectors, for the purpose of ascertaining whether or not said papers are properly delivered, as aforesaid, and whether there is any litter of papers at any place on the delivery list of said carriers; that plaintiff does not intend to carry out, and will continue to carry out, said manner of delivery" and said "superintendence"; and that the appellant does not distribute its paper otherwise than as above indicated. (Italics our own.)

In the foregoing allegations, the term "regularly" is manifestly a conclusion of the pleader's. Whether the word means twice a week, once a week, or once a month, we are not told. And here, again, the city council's conception of requisite "regularity" might well differ from that of the appellant; and the council may well, in its discretion, have concluded that the requisite regularity is so frequent as to be impracticable, and not generally observed by pub-

lishers of papers of the class to which "Shopping News" belongs; and that therefore such porch deliveries of the class of publications of which the appellant's is one should be forbidden altogether.

After a number of allegations that are either uncontroverted or immaterial, the bill continues: "That said paper cannot be delivered with beneficial results to its advertisers except in the manner hereinabove indicated, that is to say, by leaving copies thereof upon the porches or attaching copies to the door knobs of houses."

The bill then attempts to bolster up this manifest conclusion by setting forth certain alleged exigencies of the situation, dealing with the mechanical or other limitations of its publication, with reference to the days on which "sales" are held by the stores. While we are not impressed with the reasoning of the appellant in this regard, we are not disposed to discuss this matter in detail; for, as we shall see, even assuming that the appellant's reasons for using this particular method of distribution are dictated by necessity—if, as a matter of law, the city council has the right to declare such a method unlawful, the fact that the appellant, because of its particular system of publishing, would happen to be driven out of business, would not render the ordinance in question, infra, unconstitutional.

The bill next alleges that the persons to whom the paper is delivered "are greatly interested" in its contents, "look forward" to its delivery, and pick it up and read it "regularly" and "promptly." The "interest" of the public constitutes a state of mind that is a difficult subject of pleading; nevertheless, we waive that objection aside, and reserve the *materiality* of the averment for later consideration. We might note in passing, however, that again no attempt is made to define "regularly," as regards the frequency of intervals at which the paper is picked up by its "interested" readers.

Then follows a series of generalizations and legal conclusions. The bill alleges that, before the papers are delivered, "they are carefully and distinctively folded and boxed," etc.; that, because of such folding and boxing, "and also because of their weight," the copies of the paper "are not, and cannot be, blown away by the wind from their respective places of deposit and delivery," etc.; that the appellant "takes such great care and pains in the distinctive folding and boxing * * * as to insure the reception of such papers by the persons for whom they are in-

tended, and so as to guard against the littering up of the public streets and sidewalks and of the premises of persons who have not requested the delivery of such papers to them"; that the papers, so prepared and delivered, "do not and will not litter up or render unsightly either the public streets and sidewalks or private property, and do not and will not frighten horses, and do not and will not increase the fire hazard, and do not and will not injuriously affect the public health or safety or order or morals or the general welfare, and do not and will not constitute a public detriment or menace or nuisance," etc.; that the papers "retain their shape and integrity and keep their position at the place of deposit and delivery at least as well as any newspaper, whether local or metropolitan, printing news of a general nature"; that the publication "is no more likely to be blown away by the wind and is no more likely to litter up the public streets and sidewalks and private property * * * than is any newspaper * * * printing news of a general nature, which is delivered by carrier" in the same city; that the publication "is no more likely to frighten horses or to increase the fire hazard or to affect injuriously the public health, etc., than is any newspaper," etc.; that many newspapers printing news of a general nature are delivered by carrier from house to house in the same city, "without let or hindrance * * * on the part of" the appellees, and that there is no law or ordinance forbidding such delivery of such other newspapers.

There follow allegations that the appellant's stockholders are a group of corporations, which are named in the bill; that the corporations consist of several mercantile institutions and a bank; that the publication is issued for the purpose of advertising the businesses of the respective stockholder corporations; that advertising space in the publication is kept open to the general public; and that the people of the Bay region "look for and read" the publication. There are also a number of allegations as to the value of the advertising space, the high standing of the stockholder corporations, the prestige derived therefrom by the publication, and the "convenience and the general welfare of the people of said City of South San Francisco," which, it is averred, are "served and promoted by" the publication, by its aiding the people in their shopping.

The bill sets forth that the publication does not print news of a general nature, but that "all of the matter printed in said pa-

per is in the nature of general advertising." There are also uncontroverted allegations as to the inoffensive and unobjectionable character of the matter published, and an immaterial or at least redundant averment as to the publication's wide appeal, which is elsewhere, as we have seen, expatiated on in the bill.

Reference is next made to the ordinance that is the subject of the present controversy; namely, one passed by the city council of South San Francisco on February 1, 1932. A copy of the ordinance is annexed as an exhibit to the bill. Its pertinent provisions are as follows:

"Section 1. It shall be unlawful for any person, firm or corporation to distribute or cause to be distributed in the City of South San Francisco, any handbill, or any printed or written advertising matter by placing or causing the same to be placed in any automobile, or in any yards, or on any porch, or in any mail box in said City, not in possession or under the control of the person so distributing the same.

"Section 2. The provisions of this ordinance shall not be deemed to apply to any newspaper, or any publication printing news of a general nature and keeping advertising space therein open to the public, and the publishing of general advertising matter therein."

Continuing, the bill alleges that the ordinance is "unreasonable and discriminatory," in that "it discriminates in favor of newspapers printing news of a general nature and against a newspaper, and particularly plaintiff's newspaper, which prints only merchandising and financial news of an advertising nature and whose space is open to the public for general advertising, notwithstanding the interest and convenience of the residents of the * * * City of South San Francisco, or a substantial portion thereof, in having" the publication distributed in that city.

The bill further alleges that the "ordinance is unreasonable and destructive of vested rights," in that it prevents the appellant from distributing the publication, and thereby prevents it from securing the benefit of certain advertising contracts, etc.

It is also averred that the ordinance is "unreasonable and against public policy," in that "it interferes with and tends to ruin trade and commerce" between mercantile houses and the general public; that it prevents the appellant from carrying on a respectable business in South San Francisco,

against which business "no reasonable or valid objection can be raised"; that it prevents the people of that city from receiving by carrier a "newspaper" containing advertising news in which they are interested, etc.; that it is "not necessary to the protection of the public health or safety or order or morals, or the general welfare of the people" of the city; and that "it is not in the public interest."

It is further alleged that, by reason of the foregoing, the ordinance deprives the appellant of its property without due process of law, and denies the appellant the equal protection of the laws of the United States and of the state of California, contrary to section 1 of the Fourteenth Amendment of the Constitution of the United States.

The bill also asserts that the appellees, in their official capacities, have threatened to enforce the ordinance against the appellant, and subject its officers and agents to prosecution for distributing the publication; that thereby the appellant's business will be destroyed, etc.; that the appellant and its stockholders severally will suffer irreparable loss; and that the appellant has no plain, speedy, or adequate remedy at law.

The appellant prayed for an injunction restraining the appellees from enforcing the ordinance against it and from taking any action interfering with its distribution of the publication in South San Francisco, that, upon the hearing, the ordinance be declared unconstitutional, illegal, and void, and "that a perpetual injunction be issued, restraining" its enforcement.

The court below issued a temporary restraining order against the appellees, who moved for an order dismissing the bill on the ground that it failed to state facts sufficient to constitute a valid cause of action against the appellees. The court below handed down a decree dismissing the bill, with costs to the appellees.

From that decree the present appeal is being prosecuted.

The appellees concede that: "There is no question that relief against an ordinance clearly invalid may be had in a court of equity."

■■ Counsel for each side have cited decisions of lower state courts of California in support of their respective contentions. In addition, the appellees refer to a number of decisions by the Supreme Court of California. While we accord due respect to such decisions, we cannot agree with the appel-

lees as to the degree of weight that should be given to them in a case of this kind.

In support of their view that "the rule is that a Federal court will accord great weight to the decisions of the State courts in determining the validity and operation of an ordinance enacted by an agency of that state," the appellees quote the following statement appearing in 25 C. J. § 172, p. 839: "The decisions of a state court construing ordinances of municipalities within the state should be followed by the federal courts."

The appellees also cite Schmidinger v. Chicago, 226 U. S. 578, 33 S. Ct. 182, 57 L. Ed. 364. Examination of that decision, however, discloses the important limitation that the Supreme Court there tacitly recognized in applying the rule. At page 589 of 226 U. S., 33 S. Ct. 182, 185, we find the following language: "To the argument that to make exactly 1 pound loaves is extremely difficult, if not impracticable, the supreme court of Illinois has answered, and this construction is binding upon us, that the ordinance is not intended to limit the weight of a loaf to a pound or the fractional part or multiple of a pound, but that the ordinance was passed with a view only to prevent the sale of loaves of bread which are short in weight."

From the foregoing, it is clear that the Supreme Court intended merely to lay down the rule that, in ascertaining the *meaning* of an ordinance, a federal court should be bound by the decisions of the Supreme Court of the state, construing that ordinance. There is nothing in the Schmidinger Case to indicate that the Supreme Court meant to lay down the principle that, once the *meaning* of an ordinance has been ascertained by reference to state decisions, the question of the *validity* of the ordinance is one as to which those decisions are also binding upon a federal court, even in cases where that validity is attacked on federal grounds.

Such, indeed, is not the law. In the same volume of Corpus Juris as that cited by the appellees we find the rule properly stated: "The federal courts are entitled to decide for themselves where the case involves a federal question, a federal question and contract right, or a question with respect to the constitution of the United States; * * * although, in determining whether or not a state statute violates the federal constitution, the court will accept as correct the interpretation which has been placed upon such statute by the state court." 25 C. J. § 171, pp. 837, 838.

The entire independence of federal courts from state decisions in determining the validity of state enactments as tested by the Federal Constitution has been repeatedly emphasized by the Supreme Court of the United States.

In United States v. Reynolds, 235 U. S. 133, 148, 149, 35 S. Ct. 86, 90, 59 L. Ed. 162, Mr. Justice Day, who had also written the opinion in the Schmidinger Case, supra, said: "Moreover, we are here dealing with a case which involves the Constitution and statutes of the United States, as to which this court, by force of the Constitution, and the several judiciary acts which have been enacted by Congress, is the ultimate arbiter. In such cases this court must determine for itself whether a given enactment violates the Constitution of the United States or the statutes passed in pursuance thereof. The validity of this system of state law must be judged by its operation and effect upon rights secured by the Constitution of the United States and offenses punished by the Federal statutes. If such state statutes, upon their face, or in the manner of their administration, have the effect to deny rights secured by the Federal Constitution, or to nullify statutes passed in pursuance thereto, they must fail. [Cases cited.]" See, also, Metzger Motor Car Co. v. Parrott, 233 U. S. 36, 41, 34 S. Ct. 575, 58 L. Ed. 837.

Indeed, the Supreme Court has gone so far as to hold that, in certain cases, it would not be bound by state decisions even on the question of the *meaning* of a state statute.

In Corn Products Refining Co. v. Eddy, 249 U. S. 427, 432, 39 S. Ct. 325, 328, 63 L. Ed. 689, the court said: "In cases of this kind, we are concerned, not with the characterization or construction of the state law by the state court, nor even with the question whether it has in terms been construed, but solely with the effect and operation of the law as put in force by the state. [Cases cited.]" See, also, Wagner v. City of Covington, 251 U. S. 95, 102, 104, 40 S. Ct. 93, 64 L. Ed. 157, 168.

In the instant case, the sole question for determination is whether or not the ordinance under consideration violates the provisions of section 1 of the Fourteenth Amendment. That this is the sole ground of attack invoked by the appellant is made clear not only from the bill in equity, as we have already seen, but also from the appellant's assignments of error, its specifications of error, and various statements in its brief.

Indeed, the appellant itself concedes that "the general principles which have been set-

tled beyond question by the decisions of the Supreme Court of the United States, * * * must be deemed to control the instant case."

Furthermore, the Supreme Court of California has on more than one occasion expressed views in entire consonance with those by which we are being governed herein.

In Odd Fellows' Cemetery Ass'n v. City & County of San Francisco, 140 Cal. 226, 73 P. 987, 988, 989, 990, the state tribunal said:

"The decisions of this court show that ordinances have been upheld in many cases prohibiting things which could not be said to be nuisances per se, and which had not been declared to be such by any court. As instances of the exercise of such powers, it has been held that it includes the right to prohibit slaughter houses, the feeding of swill slop to cows, the throwing of rubbish, garbage, etc., except in certain designated places, the keeping of more than two cows within certain limits, the erection of wooden buildings, and the maintenance of carpet-beating establishments. [Many cases cited.] Whenever a thing or act is of such a nature that it may become a nuisance, or may be injurious to the public health, if not suppressed or regulated, the legislative body may, in the exercise of its police powers, make and enforce ordinances to regulate or prohibit such act or thing, although it may never have been offensive or injurious in the past. It is well settled that cemeteries in cities are subject to regulation or suppression by the exercise of these police powers. * * *

"It is contended by the appellants that, while it may be true that cemeteries are subject to regulation by the police power, still it is a cardinal principle applicable to such powers that any given exercise of them must be reasonable under all the circumstances appearing in the case. There are some allegations in the complaint intended to show that this particular ordinance is unreasonable. [In that case, the court held that all properly pleaded material allegations in the complaint must be taken as true.] It is well settled, however, that, except where the court can see, in the light of facts properly brought to its knowledge, that a given police regulation has no just relation to the object which it purports to carry out, and no reasonable tendency to preserve or protect the public safety, health, comfort, or morals, the decision of the legislative body as to the necessity or reasonableness of the regulation in question is conclusive. [Many cases cited.] * * *

"It has been said that, if there is a doubt as to the unreasonableness of an ordinance, 'the fact that this doubt exists is sufficient reason for the court to decline to adjudge the ordinance invalid.' In re Wilshire (C. C.) 103 F. 620. The court, therefore, cannot say as matter of law that the conditions are not such as to make it reasonable to prohibit the further burial of the dead within the city limits. In the enactment of police regulations the legislative body is not confined to present conditions alone, but may look to the future, and make such provisions as may be reasonably expected to be necessary to promote and preserve the public health and welfare in the immediate growth and progress of the city. * * *

"Each case of this character must depend largely on its own special circumstances. There are many other facts and circumstances which may have affected the legislative judgment as to the advisability of such an ordinance, and the court cannot say that they did not exist in the case at bar. * * *

"It is alleged that the ordinance was passed for private purposes and from improper motives. There is nothing on the face of the ordinance to show this, and no inquiry or proof of extraneous facts to show the motive impelling the legislative body to pass an ordinance can be allowed."

In connection with the question of motive, touched upon in the last paragraph of the foregoing excerpt, we may observe in passing that in the instant case there is not even an allegation in the bill that the ordinance was passed with improper motives on the part of the councilmen.

Again, in Re Cardinal, 170 Cal. 519, 150 P. 348, 349, L. R. A. 1915F, 850, the Supreme Court of California used the following language: "The question of classification is primarily one for the legislative power, to be determined by it in the light of its knowledge of all the circumstances and requirements, the presumption in the courts is in favor of the fairness and correctness of the determination by the legislative department, and the courts are not privileged to overturn that determination unless they can plainly see that the same was without warrant in the facts. This is but a statement of well-settled doctrines applicable in considering such questions as the one before us. * * * It may well be, however, that the special danger to the public sought to be guarded against is confined to just the class of vehicles described, viz., automobiles used on the public streets for the carriage of passengers at a very small charge, the same charge, or only

a few cents in excess of the same charge, as that made on street cars. If this be so, it was necessary to specify some amount of fare as the dividing line, and it cannot be held that the supervisors acted unreasonably in fixing that amount at ten cents. In legislating it is often necessary, for the purpose of definiteness and clearness, that some amount or number be specified as the dividing line, and the determination of the legislative body in that regard is practically conclusive, unless it be obviously unreasonable. * * * It may well be that the board of supervisors concluded that, in view of the number of this class of public conveyances that were operated upon the public streets, especially upon the principal streets already occupied almost to overflowing during the hours of heaviest traffic by street cars and other vehicles, as well as by pedestrians at street crossings, the speed at which they would naturally be operated in order to make them pay on such a low rate of fare, and the probable lack of substantial financial responsibility on the part of very many undertaking to operate such vehicles, special regulations as to condition of car, competency and fitness of operator, and the operation of the car, as well as security to protect against improper or negligent operation, were essential to the public safety. We certainly cannot say that the legislative body was not justified in so determining."

We will address our attention next to the principal contentions of the appellant.

In its opening brief, the appellant compares an ordinance of Huntington Park, Cal., with the ordinance that we are now considering. This comparison, the details of which we deem unimportant, according to the appellant, justifies "a strong suspicion" that the ordinance here involved was aimed directly at the appellant, and was adopted with the deliberate purpose of stopping the appellant's operations while leaving its chief competitors, the newspapers, free to proceed as before.

There are several answers, each one conclusive, to this argument of the appellant's.

In the first place, courts are not interested in "suspicions," however "strong" they may be. They are guided by evidence of facts, properly adduced.

Second, the record in the instant case is absolutely barren of any evidence, however tenuous, of any purpose on the part of the city council of South San Francisco to drive the appellant out of business in that community. While the complaint does allege, as we have seen, that the ordinance discriminates in favor of general newspapers, there is no averment that this discrimination is the result of any sinister intention harbored by the framers of the ordinance. Furthermore, no facts are alleged in the bill explaining why the alleged discrimination against the appellant's publication is any greater than against any other publication of the same class. Not a single fact is alleged to sustain this conclusion that the appellant was the principal target of the city councilmen.

Finally, it is a well-established rule of law that courts are not concerned with the secret motives or purposes of legislators. In support of its contention in this regard, the appellant quotes a single sentence from the opinion of Mr. Justice Holmes in the case of First National Bank v. Albright, 208 U. S. 548, 552, 28 S. Ct. 349, 350, 52 L. Ed. 614: "Accidental inequality is one thing, intentional and systematic discrimination another."

But in the instant case there is no allegation either of intentional or systematic discrimination, and the learned justice implies that both should concur before an enactment is declared invalid.

Moreover, the foregoing passing remark of Mr. Justice Holmes should be read in the light of its context, the facts of that case, the judgment therein, and other expressions by the Supreme Court.

In that case, there was a complaint or bill against certain county officials in New Mexico to enjoin the reassessment of a tax on stock and real estate upon the plaintiff bank, which the plaintiff was informed and believed the defendants would attempt. The Supreme Court of the territory dismissed the complaint as premature.

Sustaining the view of the territorial court, Mr. Justice Holmes said, in the sentence immediately preceding that quoted by the appellant: "We assume that it [the assessment of shares] would be invalid none the less if *disguised* as a tax on 60 per cent of the par value, if other moneyed capital was uniformly and intentionally assessed at one third of its actual value and if 60 per cent of the par value of the bank shares was more than one third of their actual value." (Italics our own.)

In the instant case, there is no allegation or remote suggestion in the record that the ordinance under attack contained any "disguised" provisions whatsoever. The ordinance itself, furthermore, contains no internal evidence of such disguise.

Finally, the Supreme Court has repeatedly declared that the courts are not concerned with the motives or purposes of a lawmaking body, save as they appear in the legislation itself, provided that the enactments are within the scope of the Legislature's authority.

In McCray v. United States, 195 U. S. 27, 56, 24 S. Ct. 769, 776, 49 L. Ed. 78, 1 Ann. Cas. 561. Mr. Justice White, afterward Chief Justice, observed: "The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."

Similar language was used by Mr. Justice Field in the case of Soon Hing v. Crowley, 113 U. S. 703, 710, 711, 5 S. Ct. 730, 734, 28 L. Ed. 1145: "And the rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as to the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body." See, also, In re McCardle, 7 Wall. (74 U. S.) 506, 514, 19 L. Ed. 264; Alaska Fish Salting & By-Products Co. v. Smith, 255 U. S. 44, 49, 41 S. Ct. 219, 65 L. Ed. 489; Arizona v. California, 283 U. S. 423, 455, 51 S. Ct. 522, 75 L. Ed. 1154.

We advance, then, to the consideration of the principal question in this instant case; that is to say, whether or not the city council of South San Francisco, in passing the ordinance under attack, acted, in the words of Mr. Justice White, supra, in "the exercise of lawful power."

At the outset, we may observe that we are dismissing from consideration those allegations of the appellant's bill relative to the attaching of the publication to doorknobs. The ordinance, by its terms at least, does not prohibit such a method of distribution, and, therefore, it is not clear in what respect the appellant could be said to come within the provisions of the ordinance, so far as the "door-knob method" is concerned.

Be that as it may, the bill concedes that an alternative method of distribution is also employed; namely, by leaving the papers on porches of houses. This procedure is specifically forbidden by the ordinance, and it is with this alone that we are here concerned. The appellant, in its brief, asserts that "this ordinance would, if enforced according to its terms, totally destroy the appellant's business," etc., and that "it would, further, prevent the appellant from carrying on its operations." Thus the appellant concedes that its method of distribution comes within the purview of the ordinance.

In its brief, the appellant attacks the constitutionality of the ordinance on two grounds; namely, that it deprives the appellant of property without due process of law, and that it denies to the appellant the equal protection of the laws. Since, in this case at least, the two propositions are closely linked, we will consider them together.

Both the scope and the boundaries of the Fourteenth Amendment were amply elucidated by Mr. Justice Field in the early case of Barbier v. Connolly, 113 U. S. 27, 31, 32, 5 S. Ct. 357, 359, 28 L. Ed. 923. We believe that that decision, rightly interpreted, alone disposes of most of the appellant's contentions, although we have examined other cases decided by the Supreme Court according to the same principles.

Indeed, the appellant itself quotes from the Barbier Case; but counsel seem to have overlooked a number of qualifications stated by the learned justice. Some of those limitations we are italicizing in the following excerpt:

"The fourteenth amendment, in declaring that no state 'shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness, and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circum-

stances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses. But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts, such as for draining marshes and irrigating arid plains. *Special burdens are often necessary for general benefits,*—for supplying water, *preventing fires,* lighting districts, *cleaning streets,* opening parks, and many other objects.

*Regulations for these purposes may press with more or less weight upon one than upon another,* but they are designed, not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited; but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.

"In the execution of admitted powers unnecessary proceedings are often required which are cumbersome, dilatory, and expensive, yet, if no discrimination against any one be made, and no substantial right be impaired by them, they are not obnoxious to any constitutional objection. The inconveniences arising in the administration of the laws from this cause are matters entirely for the consideration of the state; they can be remedied only by the state. In the case before us the provisions requiring certificates from the health officer and the board of firewardens *may, in some instances, be unnecessary, and the changes to be made to meet the conditions prescribed may be burdensome;* but, as we have said, this is a matter for the determination of the municipality in the execution of its police powers, and not a violation of any substantial right of the individual."

The principles announced in that case have guided the Supreme Court through the intervening decades to the present day. This is clearly demonstrated by the following extract from the opinion of Mr. Justice Cardozo in the recent case of Williams v. Mayor, Counselor and Aldermen of Annapolis, 289 U. S. 36, 42, 45, 53 S. Ct. 431, 433, 77 L. Ed. 1015:

"It is not the function of a court to determine whether the public policy that finds expression in legislation of this order is well or ill conceived. Otis v. Parker, 187 U. S. 606, 609, 23 S. Ct. 168, 47 L. Ed. 323; Missouri, Kansas & Texas Ry. Co. v. May, 194 U. S. 267, 24 S. Ct. 638, 48 L. Ed. 971; Sproles v. Binford, 286 U. S. 374, 388, 389, 52 S. Ct. 581, 76 L. Ed. 1167. The judicial function is exhausted with the discovery that the relation between means and end is not wholly vain and fanciful, an illusory pretense. Within the field where men of reason may reasonably differ, the Legislature must have its way. Otis v. Parker, supra. Nor in marking out that field will a court be forgetful of presumptions that help to fix the boundaries. 'As underlying questions of fact may condition the constitutionality of legislation of this character, the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute.' O'Gorman & Young v. Hartford Fire Insurance Co., 282 U. S. 251, 257, 51 S. Ct. 130, 132, 75 L. Ed. 324 [72 A. L. R. 1163]. * * *

"The General Assembly, weighing these and other considerations, has found them adequate to justify a temporary exemption from the burdens of taxation. *Nothing* in the Constitution of Maryland or in the decisions of her courts *enables us to say that there has been a clear abuse of power. We may not nullify for doubt alone. There must be something near to certainty."* (Italics our own.)

The great latitude allowed to the Legislature in the exercise of its police power as well as its taxing power, with respect to necessity for regulation, reasonableness of classification, and the like, has been so frequently recognized by the Supreme Court that only a few typical quotations will be necessary.

There have been many recent holdings to this effect. In State Board of Tax Commissioners v. Jackson, 283 U. S. 527, 537, 538,

51 S. Ct. 540, 543, 75 L. Ed. 1248, 73 A. L. R. 1464, the court said:

"The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction, American Sugar Rfg. Co. v. Louisiana, 179 U. S. 89, 21 S. Ct. 43, 45 L. Ed. 102, or if any state of facts reasonably can be *conceived* to sustain it. Rast v. Van Deman & Lewis Co., 240 U. S. 342, 36 S. Ct. 370, 374, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Quong Wing v. Kirkendall, 223 U. S. 59, 32 S. Ct. 192, 56 L. Ed. 350. As was said in Brown-Forman Co. v. Kentucky, supra, at page 573 of 217 U. S., 30 S. Ct. 578, 580 [54 L. Ed. 883]:

"'A very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses, or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.'

"It is not the function of this Court in cases like the present to consider the propriety or justness of the tax, *to seek for the motives or to criticize* the public policy which prompted the adoption of the legislation. Our duty is to sustain the classification adopted by the Legislature if there are substantial differences between the occupations separately classified. *Such differences need not be great.* The past decisions of the Court make this abundantly clear."

As is indicated by its title, the Jackson Case, supra, dealt with taxation. That the same latitude is permitted to the Legislature in the exercise of its police power, however, is demonstrated by many other decisions of the Supreme Court.

In Sproles v. Binford, 286 U. S. 374, 388, 389, 52 S. Ct. 581, 585, 76 L. Ed. 1167, Mr. Chief Justice Hughes used the following language: "In exercising its authority over its highways the state is not limited to the raising of revenue for maintenance and reconstruction, or to regulations as to the manner in which vehicles shall be operated, but the state may also prevent the wear and hazards due to excessive size of vehicles and weight of load. Limitations of size and weight are manifestly subjects within the broad range of legislative discretion. To make scientific precision a criterion of constitutional power

would be to subject the state to an intolerable supervision hostile to the basic principles of our government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure. Ohio Oil Co. v. Conway, 281 U. S. 146, 159, 50 S. Ct. 310, 74 L. Ed. 775. *When the subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome.*" (Italics our own.)

Again, the extreme lengths to which the judiciary may go in *assuming* that facts existed to make a given piece of legislation necessary or desirable, are strikingly shown by the closing language of the opinion by Mr. Justice Brandeis in Wampler v. Lecompte, 282 U. S. 172, 174, 175, 51 S. Ct. 92, 93, 75 L. Ed. 276: "Nor is the equality clause violated by the special provisions that in certain inland waters blinds need not be placed farther apart than 250 yards. The [Maryland] state court, relying upon Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160, said: 'Why these provisions were inserted in the statute we are not informed, *but we may assume, until the contrary is shown, that a state of facts in respect thereto existed which warranted the Legislature in so legislating.*' [Wampler v. Le Compte, 159 Md. 222] 150 A. 455, 458. *This long-settled rule* disposes of the alleged discrimination created by the special exemptions applicable to certain other waters of the State." (Italics our own.)

We will permit ourselves one more quotation on this subject, because the language used is applicable to the situation that confronts here. In Packer Corporation v. Utah, 285 U. S. 105, 110, 111, 52 S. Ct. 273, 275, 76 L. Ed. 643, 79 A. L. R. 546, the court declared:

"The Legislature may recognize degrees of evil and adapt its legislation accordingly. Miller v. Wilson, 236 U. S. 373, 384, 35 S. Ct. 342, 59 L. Ed. 628, L. R. A. 1915F, 829; Truax v. Raich, 239 U. S. 33, 43, 36 S. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545 [Ann. Cas. 1917B, 283].

"Second. The defendant contends that to make it illegal to carry out the contract under which the advertisement was displayed takes its property without due process of law because it arbitrarily curtails liberty of contract. The contention is without merit. The

law deals confessedly with a subject within the scope of the police power. No facts are brought to our attention which establish either that the evil aimed at does not exist or that the statutory remedy is inappropriate. [Cases cited.]" See, also, on the general questions of legislative discretion and on the presumption of constitutionality, Lawton v. Steele, 152 U. S. 133, 136, 14 S. Ct. 499, 38 L. Ed. 385; Gundling v. Chicago, 177 U. S. 183, 188, 20 S. Ct. 633, 44 L. Ed. 725; Jacobson v. Massachusetts, 197 U. S. 11, 25, 26, 27, 31, 38, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Williams v. Arkansas, 217 U. S. 79, 88–90, 30 S. Ct. 493, 54 L. Ed. 673, 18 Ann. Cas. 865; Schmidinger v. Chicago, supra, at pages 589, 590 of 226 U. S., 33 S. Ct. 182, 57 L. Ed. 364; Carley & Hamilton v. Snook, 281 U. S. 66, 73, 50 S. Ct. 204, 74 L. Ed. 704, 68 A. L. R. 194; Smith v. Cahoon, 283 U. S. 553, 566, 567, 51 S. Ct. 582, 75 L. Ed. 1264; Hardware Dealers Mut. Fire Insurance Co. v. Glidden Co., 284 U. S. 151, 158, 159, 52 S. Ct. 69, 76 L. Ed. 214; Boston & Maine R. R. v. Armburg, 285 U. S. 234, 240, 52 S. Ct. 336, 76 L. Ed. 729; Lawrence v. State Tax Comm., 286 U. S. 276, 283, 284, 52 S. Ct. 556, 76 L. Ed. 1102, 87 A. L. R. 374; Continental Baking Co. v. Woodring, 286 U. S. 352, 370, 371, 52 S. Ct. 595, 76 L. Ed. 1155, 81 A. L. R. 1402; Stephenson v. Binford, 287 U. S. 251, 272, 53 S. Ct. 181, 77 L. Ed. 288, 87 A. L. R. 721; Sterling v. Constantin, 287 U. S. 378, 398, 53 S. Ct. 190, 77 L. Ed. 375; Thomson v. Dana (D. C. Or., three-judge case) 52 F.(2d) 759, 763, affirmed 285 U. S. 529, 52 S. Ct. 409, 76 L. Ed. 925.

Repeatedly has the Supreme Court emphasized the advantageous position that the lawmaking power, as compared with the judiciary, occupies with reference to the knowledge of *local conditions* making a given enactment reasonable, desirable, necessary, or even imperative. Since the existence of certain local conditions may tip the scale from apparent unreasonableness to actual reasonableness, the subject is of considerable importance in the determination of the instant case. Accordingly, we will here pause to consider a few Supreme Court decisions bearing on this principle.

In McLean v. Arkansas, 211 U. S. 539, 547, 29 S. Ct. 206, 208, 53 L. Ed. 315, the following language was used: "The legislature, being familiar with local conditions, is, primarily, the judge of the necessity of such enactments. The mere fact that a court may differ with the legislature in its views of pub-

lic policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power. Jacobson v. Massachusetts [197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765], supra; Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; Minnesota v. Barber, 136 U. S. 313, 320, 10 S. Ct. 862, 34 L. Ed. 455, 458, 3 I. C. R. 185; Atkin v. Kansas, 191 U. S. 207, 223, 24 S. Ct. 124, 48 L. Ed. 148, 158."

In Dominion Hotel v. Arizona, 249 U. S. 265, 268, 269, 39 S. Ct. 273, 274, 63 L. Ed. 597, Mr. Justice Holmes said:

"The Fourteenth Amendment is not a pedagogical requirement of the impracticable. The equal protection of the laws does not mean that all occupations that are called by the same name must be treated in the same way. The power of the State 'may be determined by degrees of evil or exercised in cases where detriment is specially experienced.' Armour & Co. v. North Dakota, 240 U. S. 510, 517, 36 S. Ct. 440, 60 L. Ed. 771, Ann. Cas. 1916D, 548. It may do what it can to prevent what is deemed an evil and stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact. The only question is whether we can say on our judicial knowledge that the Legislature of Arizona could not have had any reasonable ground for believing that there were such public considerations for the distinction made by the present law. The deference due to the judgment of the Legislature on the matter has been emphasized again and again. Hebe Co. v. Shaw, 248 U. S. 297, 303, 39 S. Ct. 125, 63 L. Ed. 255. *Of course, this is especially true when local conditions may affect the answer, conditions that the Legislature does but that we cannot know.* Cusack Co. v. Chicago, 242 U. S. 526, 530, 531, 37 S. Ct. 190, 61 L. Ed. 472, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594. * * *

"If in its theory the distinction is justifiable, *as for all that we know it is,* the fact that some cases, including the plaintiff's, are very near to the line makes it none the worse. That is the inevitable result of drawing a line where the distinctions are distinctions of degree; and the constant business of the law is to draw such lines." (Italics our own.)

Again, in St. Louis Poster Adv. Co. v. St. Louis, 249 U. S. 269, 274, 39 S. Ct. 274,

275, 63 L. Ed. 599, the same learned justice said: "It is true that according to the bill the plaintiff has done away with dangers from fire and wind, but apart from the question whether those dangers do not remain sufficient to justify the general rule, they are or may be the least of the objections adverted to in the cases. [St. Louis Gunning Adv. Co. v. City of St. Louis] 235 Mo. 99, 137 S. W. 929; Kansas City Gunning Advertising Co. v. Kansas City, 240 Mo. 659, 671, 144 S. W. 1099." See, also, Hardware Dealers Mut. Fire Insurance Co. v. Glidden Co., supra; Lawrence v. State Tax Comm., supra; Wampler v. Lecompte, supra.

So in the instant case. The city council of South San Francisco knows—"but we cannot know"—whether or not the people of that community have the habit of promptly picking up advertising matter on their porches; whether or not even semiweekly supervision of the carriers' distribution of "Shopping News" is sufficient to prevent the accumulation of rubbish on the streets; and, finally, whether even the much-stressed "careful and distinctive folding and boxing" of *any* paper can prevent its being blown about by the winds. It is true that the appellant insists that the wind *"cannot"* blow its papers about; but, as we have seen, this is a mere matter of prophecy or conclusion, and not a proper pleading of fact. We have also seen that, even if we grant the past harmlessness of the appellant's method of distribution, it cannot be said as a matter of law that it will continue to be harmless.

■ The appellant has repeatedly stressed that, if the ordinance is enforced, "it will ruin and destroy" its business in South San Francisco. While we do not share the appellant's pessimism in this regard, and cannot concur in its dire predictions of ruin and destruction, even if those predictions were correct, the application of the doctrines to which we are here adhering could not be averted.

In Alaska Fish Salting & By-Products Co. v. Smith, 255 U. S. 44, 48, 41 S. Ct. 219, 220, 65 L. Ed. 489, the court said: "Even if the tax should destroy a business it would not be made invalid or require compensation upon that ground alone. Those who enter upon a business take that risk. [Many cases cited.]"

And in Murphy v. California, 225 U. S. 623, 628, 629, 32 S. Ct. 697, 698, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153: "The 14th Amendment protects the citizen in his right to engage in any lawful business, but it does not prevent legislation intended to regulate useful occupations which, because of their nature or location, may prove injurious or offensive to the public. Neither does it prevent a municipality from prohibiting any business which is inherently vicious and harmful. But, between the useful business which may be regulated and the vicious business which can be prohibited lie many non-useful occupations which may or may not be harmful to the public, according to local conditions, or the manner in which they are conducted."

■ Under the principles we have already fully discussed, the courts will allow the Legislature great latitude in determining whether or not certain businesses are "vicious," "harmful," "useful," "non-useful," all "according to local conditions, or the manner in which they are conducted."

We have already quoted from an opinion by the Supreme Court of California, to the effect that the decisions of that "court show that ordinances have been upheld in many cases prohibiting things which could not be said to be nuisances per se, and which had not been declared to be such by any court." Odd Fellows Case, supra.

As a matter of fact, however, the ordinance in question does not purport to prohibit the business of publishing or distributing a paper of the class to which the appellant's product belongs. The ordinance merely forbids the distribution of such publication by placing it into an automobile, yard, porch, or mail box "not in possession or under the control of the person so distributing the same." The ordinance does not forbid the manual delivery of the publication by the carrier to a member of the household; nor, as the appellees point out, are the United States mails closed to "Shopping News." The enactment does not prohibit the conduct of the business in question; it merely seeks to regulate the manner in which the product shall be distributed.

But the appellant attempts to allege, by way of statement of a conclusion, that "said papers cannot be delivered with beneficial results to its advertisers except in the manner hereinabove indicated, that is to say, by leaving copies thereof upon porches or attaching copies to the doorknobs of houses." The same point is also stressed in the appellant's brief.

This contention brings us to the ultimate question in the present controversy. In our opinion, the determination of this final point completely disposes of the appellant's case.

In this connection, we are assuming to be true not only the well-pleaded averments of fact in the amended bill, but also the divers conclusions, inferences, arguments, and prophecies therein contained with reference to the appellant's method of distributing its publication. In other words, we are assuming, for the purpose of this argument, that "Shopping News" is delivered to no one save to those who have "specially requested" it; that, because of the peculiar potency of the careful and distinctive folding and boxing of the papers, and also because of their weight, "they are not, and cannot be, blown away"; that the papers repose firmly on the various porches; that "Shopping News" is an object of interest to those who have asked for it; and that, as soon as they are deposited on the various porches, the copies thereof are taken inside the various houses; that such copies "do not and will not increase the fire hazard," frighten horses, etc.; that, in any event, such papers will not increase the fire hazard, frighten horses, etc., any more than will be done by any publication printing news of a general nature, as to which there is no ordinance forbidding such delivery.

We will also indulge the appellant in its inference that its carriers can tell by the exterior of a house whether or not "the occupant is away from home"; in its conclusion that the deliveries of the paper are "regularly followed up by competent men," though the bill is silent as to what constitutes such "regularity"; in its generalization that its paper cannot be delivered with beneficial results to its advertisers except on porches or on doorknobs, because of the dates of the sales held by the various stores and because of the exigencies of the paper's publication and delivery, as already set forth; and in its prophecy that, if the ordinance is enforced according to its terms, the appellant's business in South San Francisco will be destroyed.

We believe that we have hereinabove outlined the appellant's position in its most favorable light. In any event, we have considered all the averments, conclusions, inferences, arguments, and predictions with reference to the method of delivering the paper, which are contained in the amended bill.

We come now to the principle that prevents the appellant from prevailing in the present cause:

If the appellant's publication belongs to a class of papers which, when delivered according to the method forbidden by the ordinance, can reasonably be said to increase the city's fire hazard, even though the appellant's *particular* publication is delivered according to the forbidden method with such a superabundance of caution that no fire hazard could conceivably result, nevertheless the ordinance is not unconstitutional, and the appellant's publication is subject to its provisions.

There is ample authority for the foregoing proposition.

In L. & N. R. Co. v. Barber Asphalt Pav. Co., 197 U. S. 430, 434, 25 S. Ct. 466, 467, 49 L. Ed. 819, the court said: "Upholding the act as embodying a principle generally fair and doing as nearly equal justice as can be expected seems to import that if a particular case of hardship arises under it in its natural and ordinary application, that hardship must be borne as one of the imperfections of human things. And this has been the implication of the cases. [Many cases cited.]"

Referring to billiard halls, the Supreme Court, in Murphy v. California, supra, at page 629 of 225 U. S., 32 S. Ct. 697, 699, observed: " * * * Where, in the exercise of the police power, the municipal authorities determine that the keeping of such resorts should be prohibited, the courts cannot go behind their finding and inquire into local conditions; or whether the defendant's hall was an orderly establishment, or had been conducted in such manner as to produce the evils sought to be prevented by the ordinance." See, also, Barbier v. Connolly, supra, at page 31 of 113 U. S., 5 S. Ct. 357, 28 L. Ed. 923; the Dominion Hotel Case, supra; the St. Louis Poster Case, supra.

Finally, in the recent case of Bain Peanut Co. v. Pinson, 282 U. S. 499, 501, 51 S. Ct. 228, 229, 75 L. Ed. 482, the entire proposition of law was aptly summarized in the following language: "The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints. In deciding whether a corporation is denied the equal protection of the laws when its creator establishes a more extensive venue for actions against it than are fixed for private citizens we have to consider not a geometrical equation between a corporation and a man *but whether the difference does injustice to the class generally, even though it bear hard in some particular case, which is not alleged or proved here.* Louisville & Nashville R.

892

Co. v. Barber Asphalt Paving Co., 197 U. S. 430, 434, 25 S. Ct. 466, 49 L. Ed. 819; Patsone v. Pennsylvania, 232 U. S. 138, 144, 34 S. Ct. 281, 58 L. Ed. 539. This it is for the corporation to make out. *The range of the State's discretion is large.*" (Italics our own.)

▓ Applying, then, both the principles and the phraseology of the many decisions from which we have quoted herein, we cannot say that this "police regulation has no just relation to the object which it purports to carry out, and no reasonable tendency to preserve the public safety, health, and comfort." That being so, "the decision of the legislative body is conclusive."

Nor can we say that the classification adopted in the ordinance in question is unjust, unfair, or unreasonable, for "the question of classification is primarily one for the legislative power."

Though we happen, indeed, to agree with the city council of South San Francisco in the distinction made by it between papers containing general news, which are likely to be promptly picked up by their subscribers, and publications of a purely advertising nature, we wish to emphasize that we are in no sense resting the present decision upon our concurrence with the views of the council; for "it is not the function of a court to determine whether the public policy that finds expression in legislation of this order is well or ill conceived." We cannot say that "the relation between means and end" adopted by the council of South San Francisco is "wholly vain, fanciful," or "illusory." Rather do we believe that the subject-matter of the ordinance is "within the field where men of reason may reasonably differ"—as counsel in the instant case have earnestly and sincerely differed. "Therefore the legislature must have its way." "We may not nullify for doubt alone. There must be something near to certainty."

The present ordinance must be sustained, "if any state of facts reasonably can be conceived to sustain it." "We may assume, until the contrary is shown, that such a state of facts exists"; for "the Legislature, being familiar with local conditions is, primarily, the judge of the necessity of such enactments."

Finally, having found, as we have, that the ordinance in question is not "unmistakably and palpably in excess of the city council's legislative power," our decision cannot be altered by the possibility, or even the fact, that, in the present instance, "a particular case of hardship has arisen," or that the appellant has conducted its distribution of papers in such a manner as not "to produce the evils sought to be prevented by the ordinance." The hardship, if any, which the appellant has suffered, or might conceivably suffer, under the present ordinance, "must be borne as one of the imperfections of human things."

In conclusion, we desire to advert to the salutary reluctance displayed by the courts —especially, as we have seen, by the federal courts—with regard to declaring unconstitutional an enactment of the lawmaking body of a state or of any of its agencies or subdivisions. That reluctance we share.

Decree affirmed.