[Civ. No. 7977. Second Appellate District, Division Two.—July 22, 1933.]

JOHN SCHLENKER, as Administrator, etc., Respondent, v. EUGENIA EGLOFF, Appellant.

Paul Nourse and Forrest A. Betts for Appellant.

Paul Blackwood for Respondent.

ARCHBALD, J., *pro tem.*—Action by John Schlenker, as administrator of the estate of Georgia May Schlenker, for the death of the latter, his wife, through the alleged negligence of defendant Egloff. From a judgment in favor of plaintiff that defendant has appealed, the action having been dismissed as to all others.

On November 9, 1929, defendant Egloff was driving her Buick coupe on Eagle Rock Boulevard in Los Angeles, when at or near the intersection of Avenue 42 with said thoroughfare decedent came in contact with her car. At the place where the accident occurred Eagle Rock Boulevard does not run north and south but lies nearer east and west. For convenience, however, it will be treated here, as in the trial of the case, as if it ran northerly and southerly. Defendant was traveling toward Hollywood, or, as we will say, south on Eagle Rock Boulevard. Cuts of two maps of the location are attached to the reporter's transcript, each marked as though drawn to a scale. The scale of 1″ to 10″ shown on the cut marked plaintiff's exhibit 1 is clearly erroneous, as that would make the entire width of the boulevard but approximately 32.5 feet, an impossible figure considering its physical features as hereinafter shown. Defendant's exhibit "A" shows it to be approximately 65 feet wide. In establishing the fixed distances we use the scale on the latter cut, as it seems to give distances more in accord with the space required and more in consonance with some of the figures given by the witnesses. The boulevard is apparently paved on each side of a dirt strip which, according to exhibit "A", is 17½ feet wide. The strip is higher than the pavement and on it are double tracks of the Los Angeles Railway, with a space wide enough for an unloading platform between the outer rails and the inner edge

of the pavement. Each of the paved strips is approximately 23 feet in width. Avenue 42 comes into the boulevard from the west and extends across the tracks, the right of way being cut down and paved through the strip to the east roadway of the boulevard, with a width of approximately 45 feet. There is a pole about 60 feet south of Avenue 42, on the south side of the boulevard, which plays a prominent part in the evidence. Decedent having alighted from a north-bound street-car, waited for it to pass and then proceeded from the unloading platform on the east side of the right of way to the west side thereof, on a walk across the strip parallel with Avenue 42 and about opposite from the sidewalk along the south side of the avenue. She was seen by one of plaintiff's witnesses to step down from the right of way into the paved roadway over which defendant was traveling. None of plaintiff's witnesses saw her thereafter until after or about the time of the accident.

The case came on for trial before a jury on March 8, 1931. Plaintiff's attorney in his opening statement to the jury said in part: "We will show by the officer who made the investigation immediately after the accident that Mrs. Egloff told him that she had to appear at KNX station; she was broadcasting over the radio at 8 o'clock that evening and she was in a hurry to get to work . . . ; and further said, 'I am fully covered by insurance and the insurance company will pay all damages.'" On defendant's motion a mistrial was declared and the jury excused, the judge remarking: "I have always maintained that insurance has absolutely no business before the jury. . . . I don't want to put you out again and I don't want to try it, if you can make the same motion before another judge who will allow you to do it." The case was then sent back to the master calendar department and two days later was assigned to another jury department for trial. In this department the attorney for plaintiff stated that there was a question of law to decide before making the opening statement, and in the absence of the jury it was explained to the court what had happened previously and permission was asked to include the matter referred to above in the opening statement and to introduce evidence thereof on the trial as an admission against interest. The objection of defendant thereto was overruled and counsel for plaintiff said, in

making such statement: ''When the officer arrived on the scene to investigate the accident he asked the lady who was driving the car how the accident happened. She told him she had to appear at KNX to broadcast that night and was in a hurry, but she said, 'I am fully insured, and the insurance company will pay all the damages.' '' At this point the attorney for defendant objected to such statement as improper, no insurance company being involved, as prejudicial error and misconduct on the part of attorney for plaintiff in attempting to get before the jurors a matter not for their consideration and solely for the purpose and in the hope of influencing them, and asked the court to declare a mistrial. This motion was denied, the court however instructing the jury to disregard any statement of counsel or testimony ''in reference to the insurance company, except in so far as any conversation may relate to the question of negligence, if any, on the part of defendant''. Attorney for plaintiff, continuing his statement to the jury, then said: ''There is no use in picking my thread or line of thought to repeat that statement. That statement is made to you only as showing the state of the defendant's mind on the evening there immediately after the accident. I don't expect you to go up to the jury room and reason that this is against an insurance company. It is not. You decide this case the same as if no insurance or nothing was ever mentioned, and I know this jury can do that.''

Defendant was called as a witness by plaintiff under section 2055 of the Code of Civil Procedure, and among other questions and answers are the following: ''Q. Didn't the police officer Roddenberry ask you how the accident happened? A. Yes, I believe he did. Q. Didn't you reply in substance that you were going to appear at KNX and were in a hurry that night, but if you injured anyone your company would pay all the damages? A. Absolutely untrue.'' Here counsel for defendant objected to the asking of the question upon the same grounds as were urged in objection to the opening statement and also that it could not be an admission of any responsibility for the accident, assigning it as prejudicial error to bring the matter of insurance before the jury. The court overruled the objection with the announcement that it would consider the same objection

made as to any similar question whenever the matter appeared in the record and the same ruling given.

Officer Roddenberry, called as a witness for the plaintiff, was asked several leading questions relative to the conversation had with defendant after the accident, to which no objection was made until he was asked, "Did she state to you in substance that—" at which time an objection was interposed by counsel for defendant on the ground that it was very apparent that the question was leading. Attorney for plaintiff, however, contended that it was impeaching and that he had a right to ask it in the same words he had previously used in interrogating defendant. The court ruled that the witness could relate the conversation. Counsel for plaintiff then continued: "Q. Did she say anything to you about where she was going? A. She did. Q. What did she state about that? A. She said she was going to KNX broadcasting station. Q. Did she say anything about whether she was wanting to get there soon or—? A. She said she was in a hurry." Here the court stated that the witness should relate the conversation had with defendant, and the officer then said: "I asked the defendant if—where she was going, and she said she was going to KNX broadcasting station and that she was in a hurry to get there. She was afraid she was going to be late. She stated— wanted to know if the lady was hurt very bad, hurt in the accident, and I told her I didn't know, and she said— Mr. Betts [counsel for defendant]: Just a moment, that is— I think that fully answers the question. The Court: You may relate the conversation you had. Mr. Blackwood [counsel for plaintiff]: Go right ahead. A. . . . She stated she had full coverage on the automobile." Counsel for defendant at this point renewed his objection and asked the court to declare a mistrial. This motion was denied and the court stated in substance that after the witness had "related all the conversation which he had with the defendant" he would permit counsel for plaintiff to ask the impeaching question which he desired to ask. After this interruption the examination proceeded: "Q. Will you relate any further conversation, if you had not completed the statement? A. The defendant also stated she wanted the lady who was hurt to receive the very best of care, and so forth, and I told her I would have to take her

to the Highland Park police station for further investigation. She then got in her car and drove to the Highland Park station and I followed.'' The witness was then asked the so-called impeaching question: "Q. Did she state to you, Mr. Roddenberry, there at the scene of the accident, in substance as follows: 'I am in a hurry to get to KNX, I had to broadcast there, at KNX tonight, but I am fully covered, and the insurance company will pay all of the damage'? A. She did. Q. Did she further state in substance that same thing, in effect, at the station, at the Highland Park station after you got her down there? A. She did.'' On cross-examination the officer stated that he asked defendant "approximately a dozen questions" and that "she made all of those statements on the evening of the accident", but that "there was no relationship of one to the other, so far as I know of". He admitted that he knew there was no cause for a felony charge at that time and that he made no charge against defendant, and although he made a report of the case he could not remember whether he "stated there was no traffic violation or not"; that at the police station he did not ask any questions but "turned her over to the detectives, and they were handling the case from then on".

■  The sole contention of appellant is that the injection into the case of the fact of her indemnity insurance, considering the manner in which it was done and in view of the condition of the evidence under which the jury could well have found in her favor, was prejudicial error.

Certain significant facts are undisputed. It clearly appears that appellant was not due to go on the air at KNX until 8 o'clock P. M., and that she was only required to be there in time to do so; that she did not telephone the broadcasting studio that she might not be there until she called from the police station at about twenty minutes of 8; that she actually arrived at KNX at 8:01 P. M., from the police station, which is a greater distance from the broadcasting station than is the scene of the accident. There is evidence from which the jury might conclude that decedent collided with appellant's car in crossing from the sidewalk on the right of way to that directly across the roadway on the south side of Avenue 42, as there is from which it might have concluded that she was not going at right angles but

diagonally away from Avenue 42 and was hit at a point from 25 to 50 feet south of the sidewalk line. A city ordinance was introduced in evidence which makes it unlawful to cross a roadway except by the shortest route to the opposite curb and which applied to the roadway wherein the accident occurred. There is also evidence from which the jury might have concluded that appellant's car was traveling between 25 and 30 miles per hour, and other evidence—estimated by experts from skid marks measured by some of the witnesses the day after the inquest or about six days after the accident—which fixed the rate of speed at from 50 to 60 miles per hour. The investigating officer, F. M. Stay, a witness for plaintiff, testified that he found skid marks starting 10 feet north of Avenue 42 and going straight down the boulevard for a distance of 70 feet, where "they sort of swerved into the west curb line".

What we have said of the evidence shows, in our opinion, that the jury might well have decided the question of appellant's negligence either way.

Considerable doubt exists in the decisions as to just what is involved in the error urged here. ■ Undoubtedly where one charged with negligence makes a statement which may be fairly construed as an acknowledgment of responsibility, "and as part of such statement makes reference to the fact that he carries insurance", the declaration is properly admissible. (*Harju* v. *Market Street Ry. Co.*, 114 Cal. App. 138 [299 Pac. 788].) As one court has said in regard to the cases involving statements referring to insurance: "A fair conclusion, from a *résumé* of the cases, would be to class such a reference under the head of misconduct of counsel. It might be conceded that where it is obvious or fairly deducible that the sole purpose was to impress that fact of insurance on the minds of the jury, for no other reason than to create a prejudice, then a reversal will follow. But where the reference, as indicated in the cited cases, is merely incidental, misconduct will not be found." (*Noble* v. *Bacon*, 129 Cal. App. 177 [18 Pac. (2d) 699, 702].) ■ We think it is equally true that even where the record points unerringly to misconduct in the injection of the fact of insurance into the case, such misconduct would not be cause for reversal unless it had the effect of preventing the complaining party from having a fair trial.

(*Robinson* v. *Western States Gas etc. Co.*, 184 Cal. 401 [194 Pac. 39].) In other words, in order to justify a reversal, such misconduct, in our opinion, must constitute such an irregularity in the proceedings or conduct of the court, jury or adverse party as to materially affect the substantial rights of the party aggrieved. (Sec. 657 [1], Code Civ. Proc.)

■ Ordinarily the question of misconduct is one for the trial court, and its determination thereof, made on motion for a new trial, will not be disturbed unless under all the circumstances it is plainly wrong. (*LaFargue* v. *United Railroads,* 183 Cal. 720 [192 Pac. 538].) ■ The record here shows that appellant made such a motion at the time the notice of appeal was filed. The record is silent as to any further proceedings thereon. The merits of the motion were apparently not brought to the attention of the trial court, and we must conclude in the absence of a contrary showing that such motion was denied as a matter of law under section 660 of the Code of Civil Procedure. On the condition of the evidence as to the negligence of defendant alone, it would seem that the injection into the case of the very disconcerting idea of insurance might well have turned the scale in the minds of the jurors on that question, resulting in preventing her from having a fair trial of that issue.

With regard to the negligence of decedent the evidence is undisputed. Appellant's testimony is to the effect that decedent walked or ran into the side of her car. Respondent's witness Stay, the investigating officer, in describing the marks on appellant's car, said: "The left front fender was dented. There were marks on it as if being brushed by a cloth of some kind . . . just once"; that there was a dent "in the cowl . . . , the portion between the hood and the windshield . . . as from some blunt object . . . ; it was a dent that I would say, with reference to a ball, about the size of a ten pin ball, a bowling ball"; that the left front cowl light was "dented and twisted around from facing the front of the car so that the light would shine off at the side of the car", and was "bent back a little", and that "the left windwing was broken". That the damage just described, excepting the small dent in the front of the left fender, which may have touched the telephone pole

as the car reversed itself, was made by contact with decedent is admitted by counsel for respondent during the course of his argument to the jury, in answer to the question of a juror as to what the "cowl" was. After describing what was meant by the cowl of the automobile and the cowl light, he said: "She [decedent] was thrown over and she hit the cowl and made a dent in it." That she was not thrown over from the front is evident from the physical fact that the dust was brushed off "a little to the side and on top of the fender". There obviously would have been more evidence of contact than that if the car had hit decedent with the front of the fender. Appellant thought she had averted the accident when she turned the front wheels "at almost right angles", and the physical facts are more in accord with the theory that decedent walked or ran into the car, brushing the fender and falling on to the cowl head first, the head and shoulders twisting the headlight and breaking the windwing as she was thrown off the machine. In other words, the evidence seems to establish decedent's negligence almost as a matter of law.

It is to be observed that the only statement relative to insurance testified to by Officer Roddenberry, when relating the conversation had with appellant, was that "she stated she had full coverage on the automobile", and that so far as the individual statements were concerned, while made on the evening of the accident, "there was no relationship of one to the other, so far as I know of". In other words, the statement that she had full coverage was not made in connection with the statement that she was going to the broadcasting station, was late and in a hurry to get there, from which an admission of responsibility for the accident might be implied; and no such implication can be made from the mere statement that she had full coverage, made possibly in answer to a question propounded or possibly from mere thankfulness that she had the foresight to carry insurance, regardless of whether she was negligent or not—a feeling that one might well have in view of the uncertainty of the verdict in a negligence case. Nowhere did the officer testify that appellant said "the insurance company will pay all the damage", until the words were put into his mouth by the so-called impeaching question, which was combined with other statements concerning which the witness actually testi-

fied and to which he answered "she did". That is a conclusion from the statement that appellant had full coverage which respondent and the witness might make, but it should not be permitted to be given before a jury as it was here, in our opinion. "The natural tendency of a line of examination that suggests to the jury that the defendant is indemnified against any judgment for damages against him is highly prejudicial to his rights, especially in a closely balanced case where the evidence otherwise would be easily sufficient on appeal to support a verdict for the plaintiff or for the defendant." (*Citti* v. *Bava*, 204 Cal. 136, 139 [266 Pac. 954, 955].)

The trial court could only conclude from the opening statement to the jury that the statement as to insurance would be shown by the evidence to be inextricably connected with an admission against interest; but when the fact appeared that it was only so connected by counsel in his effort to get before the jury the question of insurance, then the court should, without hesitation, have granted the motion of appellant and declared a mistrial. Advising the jurors to disregard the question of insurance except as connected with an admission of liability, and instructions to that effect did not repair the damage, as is shown by the fact that the jury gave no heed to almost conclusive evidence of decedent's negligence in failing to notice an oncoming lighted car and in walking into the side of it.

Judgment reversed.

Works, P. J., and Craig, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 19, 1933.