[Civ. No. 8620. Fourth Dist., Div. Two. Feb. 15, 1968.]

MARVIN J. MENEFEE, Plaintiff and Appellant, v. DAVID WILLIAMS, Defendant and Respondent.

Dennis D. Hayden for Plaintiff and Appellant.

McBain & Morgan, Angus C. McBain, James L. Roper and Elmer O. Docken for Defendant and Respondent.

McCABE, P. J.—We have determined the trial court ruled correctly in not allowing a statement regarding liability insurance to be admitted into evidence and in instructing the jury on the issue of contributory negligence.

The plaintiff, Marvin Menefee, met the defendant, David Williams, while "sighting in" his rifle at the Orange Coast Gun Club preparatory to deer season sometime in late 1964. The two became acquainted and agreed to meet in Colorado for the deer hunting season with two friends of the defendant, Roy Chism and Clyde Bickery. Plaintiff met these three companions in Dolores, Colorado, after driving to that city by himself in a pickup truck with the usual camper attachment. By the morning of October 18, 1964, the four had established a hunting camp in a mountainous region near Cortez, Colorado. That morning the plaintiff, utilizing a .30-'06 caliber rifle,

killed a deer and carried it back to the hunting camp where he cleaned it and quartered it. As a consequence of this act, there was a great deal of fresh blood on the ground in and around the camp.

Later that day either Chism or Bickery made another kill in the bottom of a nearby canyon and both of these hunters went down into the canyon to carry out the deer. According to the testimony of Chism, due to the roughness of the terrain neither of these men made it out of the canyon until after the moon had risen. All parties admit, however, there were several hunters' camps within a mile radius of the place of the accident hereinafter described.

After Chism and Bickery had left, and about 3 p.m. on that date, Menefee and Williams drove to an area away from the camp, left plaintiff's truck located near the spot where plaintiff had made his "kill" that morning, and proceeded down a deep canyon. According to plaintiff Menefee, they didn't see any deer, and because the sun was getting low, he climbed the east canyon wall and returned to the truck by following an abandoned railroad right-of-way. He approached the truck from the south along this raised embankment.

Defendant Williams separated from Menefee and proceeded back through the canyon to a point which he believed was directly below the truck. He attempted to climb out of the canyon at that point, but was unable to do so due to the steepness of the canyon wall, and proceeded northerly up the canyon to a point where he was able to climb out. He thus approached the truck from the north.

The truck was parked in a small clearing near the railroad embankment, which embankment was surrounded by heavy brush and scrub oak on all sides. Plaintiff Menefee, arriving about a quarter of an hour before sundown, kicked out a place on the embankment and seated himself so that he might observe any deer that might cross the railroad right-of-way through a small clearing south of his position. Plaintiff was wearing a red hunting cap and black and red plaid jacket. From his position, as thus seated, only his head and possibly a portion of his shoulders protruded above the level of the railroad embankment and surrounding brush. He remained seated in this position for a period of forty-five minutes. During this time he did not hear any sounds or gun shots.

The evidence is not clear, but at the end of this period either as he was sitting there, or just as he started to get up, plaintiff heard a gun report and felt an intense pain in the region of his right hip. Plaintiff Menefee did not know from which direc-

tion the bullet came or in which direction he was facing when struck. He attempted to get up, but his right leg gave way and he fell to the ground. According to plaintiff, he then started crawling toward the truck, some 25 feet distant, when he saw defendant Williams on top of the railroad embankment some 60 yards to the north. He called for "help" five or six times and waved his hands overhead in a circular motion. Williams did not acknowledge plaintiff's presence, although he was facing Menefee and held a rifle in his two hands. Williams then moved behind some brush. According to plaintiff he finally reached the truck, unlocked it, pulled himself into the driver's seat, and slumped off that seat onto the floor. Defendant Williams then arrived at the truck, discovered Menefee's condition, and at plaintiff's request, retrieved Menefee's rifle. Defendant Williams applied a tourniquet to plaintiff's right leg.

According to defendant's testimony, he returned to the truck because it was too dark to hunt. As he returned, he heard more than 10 shots fired in the 20 minutes before he encountered the injured Menefee, but none immediately prior to that encounter. He first heard Menefee "hollering" and located him on hands and knees alongside his truck, trying to get into it. He ran to the plaintiff, found he was suffering from shock and was incoherent. Defendant opened the truck and aided the plaintiff in lying down inside. He then rendered the aid above detailed and returned to the camp to leave a note for Bickery and Chism, which stated: "Oh, my God, Menefee has been shot, and I am taking him into hospital. Dave."

Defendant drove Menefee into the hospital in Cortez. There it was discovered Menefee was wounded in two places, once in the right buttock, apparently the point of entry, and again three or four inches above the right knee, a wound about the size of the top of a thumb, apparently the point of exit of the projectile. A doctor treated the plaintiff and removed a bullet fragment which he turned over to the county sheriff.

During the hunt in Colorado, defendant Williams, aged 30, carried a .243 caliber Winchester rifle throughout the hunt on October 18, 1964. Expert testimony indicated this caliber weapon characteristically has a high muzzle velocity in the neighborhood of 3,000 feet per second. Additionally, Williams "handloaded" [sic, made at home] his own ammunition utilizing a specific type of sporting bullet to obtain a higher and more reliable performance during firing than is available with commercial ammunition. That evening at the hospital Williams' rifle apparently was unloaded in the presence of two

witnesses and was found to be fully loaded. At some point in the sequence of events plaintiff thought he might have shot himself. Defendant had recovered plaintiff's rifle and found it contained a live round in the firing chamber.

On the night of the accident Sheriff Hammond questioned both Williams and Menefee at the hospital. The following day the sheriff, accompanied by defendant Williams, visited the scene of the accident where they located what they believed to be the spot Menefee had been sitting, but were unable to follow his trail from that point to his truck due to the blood from the deer Menefee had cleaned on the spot previously. On this trip to the scene defendant was carrying a gun. According to Sheriff Hammond's testimony at trial, Williams, ". . . whenever he would hear anything rustle in the leaves, he would come around with his gun like that, bring it up in a quick jerk like that, like he was kind of nervous."

At trial, in addition to the testimony above detailed, George Lacy qualified as plaintiff's expert witness and he testified he had examined the bullet fragment removed from plaintiff's body, but was unable to identify the weapon from which the bullet was fired or the caliber of the bullet. He admittedly had not had time to perform qualitative or quantitative analysis tests on the fragment as an alternate means of identification.

In response to a hypothetical question, Mr. Lacy stated that in his opinion if a person was struck by a bullet at the same time he heard the shot, he would have to be very close to the gun that fired the bullet since the speed of sound is considerably less than the muzzle velocity of a .243 caliber weapon (3,000 feet per second) which drops off abruptly after firing. He further stated at close range a .243 caliber sporting bullet has a tendency to disintegrate upon impact, and therefore the bullet which struck plaintiff had to be fired from a range of less than 300 yards, but could have been fired from as little as 50 yards.

It is admitted by both parties that the hunting regulations of the State of Colorado prohibit hunting one-half hour after sundown and that these regulations were known by both parties at the time of the accident. It is to be noted that if the testimony is believed that plaintiff first sat on the embankment a quarter of an hour before sundown and remained for 45 minutes before the accident, a question of fact is presented as to the application, if any, of this statute.

In instructing the jury, the court gave instructions upon contributory negligence.

Upon this state of evidence, the jury returned a verdict in favor of the defendant. A motion for new trial was made and denied. Plaintiff appeals from the judgment entered in accordance with the verdict.

 Prior to the commencement of the trial and in chambers in the presence of a reporter, plaintiff made an offer of proof that at about the time defendant had started to drive plaintiff to the hospital from the scene of the accident, defendant stated to the plaintiff: "Don't worry, if your insurance doesn't cover this, mine will." The court ruled this statement was inadmissible, and ". . . counsel will not attempt to offer the statement into evidence." At the proceedings in chambers, plaintiff asked the court if the ruling would be different if the statement was: "Don't worry, Marvin, if your insurance doesn't cover it, mine will." In reply the court stated the ruling would be the same. Also, plaintiff represented to the court the statement was part of the res gestae and therefore admissible. The court denied the statement's admissibility under the res gestae doctrine. Plaintiff urges the rulings of the court constitute prejudicial error.

Plaintiff at this hearing also offered to prove a subsequent conversation in the hospital after plaintiff had a blood transfusion in which plaintiff asked the defendant if he shot him, and received a negative response. Then plaintiff asked: "Well, why did you tell me that your insurance would cover this incident?" Defendant purportedly responded: "Must have been out of my mind when I said that." This rejection is also cited as error. From the transcript of the proceedings in chambers, it is clear the court's ruling was premised on the reasoning that the statement or statements were not subject to the construction that it contained an admission of fault on the part of defendant.

Section 1155, Evidence Code, as enacted in 1965 and effective as to the instant trial, provides: "Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible to prove negligence or other wrongdoing." The Law Revision Commission's comment on this enactment was simply that this section 1155, *supra,* codifies the existing law as first pronounced in *Roche* v. *Llewellyn Iron Works Co.,* 140 Cal. 563 [74 P. 147].

Although not directly decided in *Garfield* v. *Russell,* 251 Cal.App.2d 275, 279, fn. 3 [59 Cal.Rptr. 379], by a footnote,

it is stated that section 1155, Evidence Code, only applies to liability insurance.

Before reaching the issue of the application of section 1155, it is necessary to determine whether defendant's statement or statements were an admission of fault.

Numerous cases have stated that when the mention of insurance is incidental to the statement of admission of fault, such as to prove ownership of an automobile or to prove employment, there is no error in admitting the evidence of insurance. (Witkin, Cal. Evidence (2d ed. 1966) § 375, p. 333.)

■ Also, when insurance coverage is mentioned in a statement made by defendant, which statement contains an admission of fault, the probative value of the evidence outweighs the prejudicial effect of the statement. (*McPhee* v. *Lavin*, 183 Cal. 264, 269 [191 P. 23] ; *Dullanty* v. *Smith*, 203 Cal. 621, 625-626 [265 P. 814] ; 19 Cal.Jur.2d, Evidence, § 396.) When the statement of insurance is not a part of an admission of fault, it is prejudicial error to admit it. (*Squires* v. *Riffe*, 211 Cal. 370, 373 [295 P. 517] ; Witkin, Cal. Evidence (2d ed 1966) § 374, p. 332 et seq.)

■.In the proffered evidence of the statement made in the vehicle in this case, there is no prologue or epilogue. The trial court was presented with a bare unexplained statement regarding the defendant being insured. In such context the trial court properly ruled it inadmissible for the mere admission of the existence of liability insurance is not proof of liability for an accident. (*Citti* v. *Bava*, 204 Cal. 136, 139 [266 P. 954] ; *Roche* v. *Llewellyn Iron Works Co.*, *supra*, 140 Cal. 563; *Nason* v. *Leth-Nissen*, 82 Cal.App.2d 70, 74 [185 P.2d 880] ; *Cosby* v. *Rimmel*, 82 Cal.App.2d 415, 416-417 [186 P.2d 215] ; *Schlenker* v. *Egloff*, 133 Cal.App. 393, 401-402 [24 P.2d 224].)

Defendant's statement made in the vehicle within the context of the facts before the trial court and on this appeal cannot fairly be construed as an admission of fault. In this regard the provisions of section 1155, *supra*, are particularly compelling.

Recognizing the rules of admissibility of the evidence, plaintiff claims that the statement is admissible as part of the *res gestae*. In this attempt, plaintiff must fail. Under the *res gestae* doctrine which is an exception to the admissibility of hearsay statements, the statement must tend to explain or tend to prove the nature, motive, purpose or intent of the act or transaction. (19 Cal.Jur.2d, Evidence, § 448.)

Assuming, *arguendo,* the defendant's statement was part of the res gestae, it, as the trial court and we have determined, does not tend to explain or tend to prove an admission of fault on the part of defendant. Thus, the statement has no probative value.

The first statement which referred to defendant's insurance being inadmissible, there was no ground for admitting the conversation at the hospital. In the conversation at the hospital, defendant, upon a question directed to him, denied he shot plaintiff. When plaintiff then stated, ". . . why did you tell me that your insurance would cover this incident," the defendant allegedly stated, "Must have been out of my mind when I said that." Had this conversation been admitted after the conversation regarding insurance coverage, it would have (1) been a direct and unequivocal denial of fault, and (2) to have been admitted for impeachment purposes. Had this conversation been admitted *without* the statement regarding insurance coverage being part of the record, it would have been a direct and unequivocal denial of fault and would not have been impeaching testimony for there would have been no testimony to impeach.

Separated from that part of the conversation wherein defendant denied fault, the remainder of the conversation in the hospital contains no element of an admission of fault, therefore, in and of itself, had no probative value. The court properly ruled the conversation at the hospital was inadmissible.

It is argued that both conversations should have been admitted into evidence and the impact of the combined conversations would reflect an admission of culpability. Obviously, the conversations in combination could not be admitted under the res gestae doctrine.

To be admissible the totality of the conversations must express an admission of fault. At best the combined statements are equivocal as an admission of fault. Being equivocal and the fact of liability presenting a close question for the trier of the fact, the statements should not be allowed into evidence. The prejudicial effect of such evidence under the facts of this case far outweighs any probative value. The possibility that the sheriff in Colorado heard the conversation in the hospital adds nothing to the admissibility of the evidence.

The only other point raised by the plaintiff on this appeal is the contention that the trial court erred in submitting instructions on plaintiff's contributory negligence to the jury.

It is significant to point out that both plaintiff's and defendant's separate pretrial statements specified contributory negligence as an issue in dispute; the joint pretrial statement and order also include this issue; it was argued to the jury; and plaintiff and defendant joined in requesting BAJI jury instruction 21 revised, as modified. Among other issues, this instruction informed the jury the defendant had the burden of proving the issue of plaintiff's negligence and proximate cause by a preponderance of the evidence. The record before us does not reflect that plaintiff made any objections to the trial court giving other instructions offered by defendant on plaintiff's contributory negligence. Plaintiff offered BAJI 136, and it was given to the jury by the trial court.

Each party to an action is entitled to have his theory of the case submitted to the jury, and it is incumbent upon the trial court to instruct upon all material issues involved. (*Edgett* v. *Fairchild*, 153 Cal.App.2d 734, 738 [314 P.2d 973].)

In determining whether the evidence supports the theory of the requested instruction, an appellate court must view the evidence in favor of the party requesting the instruction. (*Sills* v. *Los Angeles Transit Lines*, 40 Cal.2d 630, 633 [255 P.2d 795].)

There is substantial evidence together with the inferences which reasonably could be drawn therefrom from which a trier of fact could find negligence on the part of plaintiff, and that it was a proximate cause of the accident.

This conclusion is particularly compelling if one recalls that the failure of the trial court to so instruct, if requested, would have been a holding as a matter of law that plaintiff was *not* contributorily negligent. Such a holding would be particularly susceptible to attack on appeal. (*Anthony* v. *Hobbie*, 25 Cal.2d 814, 818 [155 P.2d 826]; *Summers* v. *Tice*, 33 Cal.2d 80, 83 [199 P.2d 1, 5 A.L.R.2d 91].)

Judgment affirmed.

Tamura, J., and Gabbert, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.