[Civ. No. 43565. Second Dist., Div. Two. May 14, 1975.]

HOSSEIN FARMY, Plaintiff and Respondent, v.
COLLEGE HOUSING, INC. et al., Defendants and Appellants.

## COUNSEL

Booth, Mitchel, Strange & Smith, Cyril E. Armbrister, Jr., and Stephen H. Galton for Defendants and Appellants.

Kermit J. Morgan for Plaintiff and Respondent.

## OPINION

**ROTH, P.J.**—Plaintiff-respondent was awarded a judgment enjoining a nuisance in the first phase of a bifurcated trial on the equity side of the court against defendants-appellants CNA-Scope Development Company, a joint venture, CNA Realty Corporation, a corporation, College Housing, Inc., a corporation, doing business as Scope Corporation, and in the second phase tried before a judge and jury, won a jury verdict against appellants for $99,500 compensatory damages and $45,000 punitive damages. No appeal was taken from the permanent injunction. This appeal is from the judgment entered on the verdict for damages.

Respondent complained that despite his repeated protests appellants operated La Mancha, an apartment house contiguous to his, continuously from the time of its occupancy to the date of the jury verdict in such a manner as to infringe upon his rights of quiet possession in respect of his property, causing loss of tenants and personal injury to his health, strength and activity.

Evidence was introduced by declaration and court view of the La Mancha premises in the injunctive facet of the trial and by oral testimony, exhibits and court and jury view of the premises in the damage facet thereof.

We state the evidence and all logical inferences which may be drawn therefrom to support the judgment as per mandate of *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427 [45 P.2d 183].

Respondent owned continuously since 1951 and operated a non-airconditioned eight-unit apartment property (Hilgard) close to the campus of UCLA at 932-934 Hilgard Avenue in the City of Los Angeles. Commencing in December 1968 appellants constructed on land conti-guous to the north of Hilgard a 15-story apartment building (La Mancha) with a 50-foot subterranean garage for rental to UCLA students. La Mancha was completed in September of 1969 and occupancy and operation thereof commenced in October 1969. La Mancha and Hilgard were partially separated in the front by an alley approximately 15 feet wide and approximately 50 feet long to the east.

Large motor-driven exhaust fans were installed as part of the south portion of La Mancha, and from the time operation thereof was commenced the exhaust fans and other fans in the structure discharged into, onto and over Hilgard polluted air sucked in by said fans. The polluted air came from La Mancha's multi-story subterranean garage, filled with motor vehicles of its tenants, augmented by fans which discharged air originating in the kitchen, cafeteria and other parts of La Mancha. The motors operating the fans created loud noises and were extremely disturbing to respondent and his tenants, prevented sleep and were injurious to health. The noise of the fans was periodically aggravated by: a pickup truck which removed trash from La Mancha in the early morning hours of each day as early as 5 a.m.; a public address system operated periodically during the day or night; loud music played by student-tenants at times late into the night with amplified rock bands; fire alarm systems activated periodically day and night, and the use of a swimming pool by student-tenants at all hours of the night. The student-tenants of La Mancha threw beer cans, rolls of toilet paper, rocks and all sorts of trash out of the windows onto Hilgard; La Mancha provided only 173 parking spaces for 900 tenants and as a consequence of traffic thus created by La Mancha tenants and their visitors respon-dents and his tenants were periodically blocked from entering and using their garages.

The noise was so loud respondent's tenants had to keep their windows closed to carry on normal conversations; tenants with bedrooms facing La Mancha could not use their bedrooms; Hilgard was designed for cross-ventilation and tenants therefor had to choose between being unbearably hot when the windows were closed or opening windows and

being assaulted by the noise of the fans of La Mancha and the foul and noxious smells thrust upon them; respondent was unable to use his own bedroom because of constant vibration and had to sleep on the living room floor; respondent had trouble renting his apartments and his tenant turn-over has been high; he had to begin renting his apartments to less reliable people, and to discount the rent. The higher vacancy factor and forced reduction of rents created a loss in rental of approximately $3,100 a year. Respondent was emotionally and physically affected by the pressures created by the operation of La Mancha; he developed high blood pressure; obtained medical attention and saw psychiatrists and on one occasion was hospitalized. An M.D. ex-tenant testified: "Mr. Farmy has become progressively more agitated; he dwells on the problems of his lawsuit . . . . [H]e has had changes in his complexion; he has become more palid; he has put on some weight; and in general he appears now as an agitated and ill man." Another ex-tenant who was also an M.D. stated that if she were to see respondent on the street she would recommend that he see a doctor. The doctor who treated respondent testified that since 1968 when respondent began to complain about La Mancha he had developed high blood pressure and is hypertensive.

Respondent's complaint was filed March 12, 1970. No ex parte restraining order was requested. On July 23, 1970, a motion for a temporary injunction supported by respondent's declarations was filed and calendared for August 7, 1970. Respondent's motion was augmented in the meanwhile by other declarations, was further continued and finally heard on September 25, 1970, and submitted. On October 21, 1970, the trial judge, having in the meanwhile by minute order granted injunctive relief as to the two large exhaust fans, did with the consent of the parties by a second minute order grant appellants 60 days within which to install silencers on certain of the fans. The order was as follows: "The preliminary injunction herein granted is suspended, . . . , for . . . sixty days from the date hereof, pending the expeditious installation by the defendant of any and all silencers, accoustical mufflers, or other noise reduction devices between the fan and exhaust outlets of the ventilators, or otherwise, which service the subterranean garages, the effect of which must be substantially to reduce the decibel count within tolerable limits."

During the 60-day period a motion to modify the proposed preliminary injunction was made by appellants. Thereafter because of the installation of muffler equipment by appellants or apathy or inability of respondent to convince the court in respect of any further necessary

specifics of a preliminary injunction, the formal issuance of any preliminary injunction was delayed by periodic continuances until the case was called for trial on July 27, 1971. On August 16, 1971, the trial judge issued a memo of decision. Respondent submitted a proposed permanent injunction on December 17, 1971. A permanent injunction was signed on January 14, 1972, 21 months after respondent had commenced his action.

The permanent injunction in pertinent part enjoined appellants: "1. From operating the dishwasher fan, between the hours of 8:00 P.M. and 7:00 A.M. o'clock. 2. From operating any of the three other trash room fans (library fan, toilet fan or storage room fan) between the hours of 9:00 P.M. and 8:00 A.M. o'clock. 3. From operating either of the two vault room fans between the hours of 9:00 P.M. and 7:00 A.M. in the event the combination of the vault room fan and/or fans and/or the garage fan, with no trash room fans operating, causes the sound in any room of . . . [Hilgard] to exceed five DBA's over the then ambient in such room with all fans off. 4. From operating any fan (except the garage fan alone), or any combination of fans, excluding the garage fan, between the hours of 7:00 A.M. and 9:00 P.M. o'clock so as to cause the sound in any room of . . . [Hilgard] to exceed seven DBA's over the then ambient sound level in such room with all fans off. 5. From permitting and/or causing the defendants' trash to be collected at any time earlier than 8:00 A.M. o'clock."

The permanent injunction defined: " 'AMBIENT NOISE' is that noise level which exists at a time when all noise making equipment located along the ground level of the southern property line of defendants' premises is not operating."

The injunction continued: " . . . IT IS FURTHER ORDERED, . . . THAT: 1. Defendants either keep locked or keep screens on all windows on the south side of defendants' building, except on those windows of those rooms occupied by a tenant who has furnished to the defendants a medical doctor's written request that said tenant occupy a room with a window that can be opened by said tenant; said medical doctor's written request shall be based upon medical reasons requiring an open window; and upon written request, defendants must exhibit such document to plaintiff. 2. Defendants conscientiously maintain and enforce its present system of security guards, house counsel, house counselors and the immediate processing of complaints of the neighbors."

" . . . IT IS FURTHER ORDERED, ADJUDGED AND DECREED THAT: 1. Defendants . . . upon receipt of at least 72 hours written notice from the plaintiff, shall cause any and all noise making equipment located upon the ground level of defendants' southern property line to be completely shut off. That said written request served by the plaintiff . . . shall state the date and the time specifically on which he wishes to conduct tests. *That the order in which said equipment shall be turned off at said time and/or times shall be completely at the discretion of the plaintiff.* 2. Plaintiff may make such requests in order to determine the ambient noise level and any other noise levels pertaining only to the equipment located upon the ground level of defendants' southern property line. Said tests may be conducted no more often than once per calendar month in either day time or night time so long as each test does not consume more than two consecutive hours of time. 3. *That during the time specified in each request, and while the plaintiff and/or his agents are conducting said tests, the defendants, and each of them, shall cooperate with plaintiff and shall do nothing to interfere with his causing accurate tests* to be made of the then ambient noise level, the noise caused by any one or more pieces of noise making equipment located upon the ground level of the defendants' southern property line, and/or of the gas content of the air; and under no circumstances will defendants be required to turn off any *of its noise making equipment other than that equipment located* along the ground level of defendants' southern property line." (Italics added.)

The injunction specifically recited: "4. . . . the operation of the *garage fan, without any other fans in operation, does not constitute a nuisance* at this time. 5. . . . the air turbulence, odors or unhealthy fumes conveyed to Plaintiff's Property by defendants' *fans do not constitute a nuisance* at this time. 6. . . . the *vehicles parking in and blocking the driveway of plaintiff's property, loud noises caused by defendant's tenants and guests, and the defendants' trash disposal operation do not at the present time constitute a nuisance for which defendant is responsible* to plaintiff." (Italics added.)

Respondent did not at any time seek to invoke any of the sanctions of the above injunction. Nor is there any evidence that it was violated or that respondent served a notice at any time seeking a testing of the offending equipment.

Appellants in a motion for a new trial sought a broader more specific injunction. It was denied.

Special interrogatories were submitted to the jury after the verdict. The jury responded that of the $99,500 verdict for compensatory damages, $64,675 had been apportioned to the nuisance caused by " . . . the southerly ground level exhaust fans or machines . . . and that of the total compensatory award $34,825 . . . is separate . . . and unrelated to . . . fans and machines."

Appellants did not appeal from the injunctive portion of the judgment. They thus concede that a nuisance for which they were responsible calls for relief and admit liability for damage. Their appeal from the judgment for damages is based on two grounds: (1) insufficiency of the evidence to sustain the amount of the judgment of compensatory damages and (2) a lack of any evidence to sustain that part of the judgment which awards punitive damages. We agree with appellants in respect of the latter ground and discuss the first ground only insofar as it is expressly or impliedly related to punitive damages.

Our Civil Code section 3479 insofar as pertinent here, defines a nuisance as "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, . . ." This section has been liberally construed. (*Judson* v. *L. A. Suburban Gas Co.* (1910) 157 Cal. 168 [106 P. 581]; *Hulbert* v. *California etc. Cement Co.* (1911) 161 Cal. 239 [118 P. 928]; *Woods* v. *Johns* (1966) 241 Cal.App.2d 278 [50 Cal.Rptr. 515]; *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265 [288 P.2d 507]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920 [101 Cal.Rptr. 568, 496 P.2d 480].)

In *Hulbert* v. *California etc. Cement Co.* (1911) 161 Cal. 239 [118 P. 928], the court said at pages 245-246: "It is well settled in California that a nuisance which consists in pouring soot or the like upon the property of a neighbor in such manner as to interfere with the comfortable enjoyment of the premises is a private nuisance which may be enjoined or abated, and for which likewise, the persons specially injured may recover pecuniary damages. (Code Civ. Proc., sec. 731; *Fisher* v. *Zumwalt,* 128 Cal. 493, [61 Pac. 82]; *Melvin* v. *E. B. & A. L. Stone Co.,* 7 Cal.App. 328, [94 Pac. 390]; *Judson* v. *Los Angeles Sub. Gas Co.,* 157 Cal. 169, [25 L.R.A., (N.S.) 183, 106 Pac. 581].) The last-named case was one in which the operation of a gas factory had been enjoined and the following language was used: 'A gas factory does not constitute a nuisance *per se.* The manufacture in or near a great city of gas for illuminating and heating is not only legitimate but is very necessary to

the comfort of the people. But in this, as in any other sort of lawful business, the person conducting it is subject to the rule *sic utere tuo ut alienum non laedas,* even when operating under municipal permission or under public obligation to furnish a commodity. (*Terre Haute Gas Co.* v. *Teel,* 20 Ind. 131; *Attorney-General* v. *Gaslight & Coke Co.,* L.R. 7 Ch. Div. 217; *Sullivan* v. *Royer,* 72 Cal. 248, [13 Pac. 655].) Nor will the adoption of the most approved appliances and methods of production justify the continuance of that which, in spite of them, remains a nuisance. (*Evans* v. *Fertilizing Co.,* 160 Pa. St. 223, [28 Atl. 702]; *Susquehanna Fer. Co.* v. *Malone,* 73 Md. 276, [25 Am. St. Rep. 595, 20 Atl. 900, 9 L.R.A. 737]; *Susquehanna Fer. Co.* v. *Spangler,* 86 Md. 562, [63 Am. St. Rep. 533, 39 Atl. 270].)' " Analysis of the above cases, particularly *Hulbert,* emphasizes that exercise of rights legislatively granted even though the conditions of the exercise thereof are complied with in all respects will not immunize one from a nuisance claim.

Civil Code section 3294 authorizes punitive damages when a defendant has been guilty of " . . . oppression, fraud, or malice."

At bench there is no claim or evidence of fraud. Malice and oppression are defined by the cases.

█  To prove that a tort was maliciously perpetrated it is not necessary to establish *a specific intent against the person* wronged. Oppression or malice supplying such intent may be established by the conduct of the perpetrator. In our opinion no such conduct as defined by the cases (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908 [114 Cal.Rptr. 622, 523 P.2d 662]; *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339 [87 Cal.Rptr. 226]) has been proved.

The presence or absence of oppression or malice must be analyzed and weighed in the light of the rights of the respective parties.

In a nuisance case a determination between contiguous landowners who have co-equal rights is and has been since 1610 a sensitive and difficult problem even for the purpose of assessing compensatory damages. (*William Aldred's Case,* 9 Co. Rep. 571, 77 Eng. Rep. 816.)

Prosser, Law of Torts (4th ed. 1971) § 89, page 596: "Most of the litigation as to private nuisance has dealt with the conflicting interests of landowners, and the question of the reasonableness of the defendant's conduct. *The defendant's privilege of making a reasonable use of his own*

*property* for his own benefit and conducting his affairs in his own way *is no less important than the plaintiff's right to use and enjoy his premises. . . . . Some balance must be struck between the two.* The plaintiff must be expected to endure some inconvenience rather than curtail the defendant's freedom of action, and the defendant must so use his own property that he causes no unreasonable harm to the plaintiff. The law of private nuisance is very largely a series of adjustments to limit the reciprocal rights and privileges of both. In every case the court must make a comparative evaluation of the conflicting interests according to objective legal standards, and the gravity of the harm to the plaintiff must be weighed against the utility of the defendant's conduct." (Italics added.)

Prosser also says at page 571: "There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance'. It has meant all things to all men, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition."

The record is clear that: appellants at all times complied with all building ordinances and regulations of the City of Los Angeles; there is no city ordinance with respect to noise level, and that they did not violate any zoning ordinance in the location of or in the building of La Mancha. There is no evidence that La Mancha was an improper improvement for a large university community. It is settled that a city has great latitude in its determination of whether an improvement is harmful or useful to a section of its community. (*San Francisco S. News Co.* v. *City of So. San Francisco* (9th Cir. 1934) 69 F.2d 879, cert. den., 293 U.S. 606 [79 L.Ed. 697, 55 S.Ct. 122].)

To balance co-equal rights of adjacent property owners to the use and enjoyment of their respective property when the alleged offender has in all respects complied with laws encouraging and authorizing such specific use (*San Francisco S. News Co.* v. *City of So. San Francisco* (9th Cir. 1934) 69 F.2d 879, cert. den. 293 U.S. 606 [79 L.Ed. 697, 55 S.Ct. 122]) is perplexing enough when the injured party claims compensation for objective and subjective damage, but it does indeed become a "jungle" of rationalization[1] when the injured party claims in addition that he is entitled to punitive damage.

---

[1]The nuisance at bench would not be the basis of any cause of action if it did not inherently involve vexation, harassment and annoyance on a continuous or periodic

The criterion for an award of punitive damages is set forth in two recent cases.

In *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908 [114 Cal.Rptr. 622, 523 P.2d 662], the court says at page 922: "Defendants contend, however, that since they had no intent to vex, annoy or injure plaintiffs, exemplary damages cannot be awarded. (See *Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891, 894 [99 Cal.Rptr. 706]; *Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 526-527 [322 P.2d 933].) We assume defendants felt no personal animus toward plaintiffs. But 'intent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he knows are substantially certain to result from his conduct. (Rest. 2d Torts, § 8a; Prosser, Torts (4th ed. 1971) pp. 31-32.)[2] The jury in the present case could reasonably infer that defendants acted in *callous* disregard of plaintiffs' rights,[3] *knowing that their conduct was substantially certain* to vex, annoy, and injure plaintiffs. Such behavior justifies the award of punitive damages." (Italics added.)

■ Oppression for which punitive damages may be awarded "means subjecting a person to *cruel* and *unjust* hardship in conscious disregard of his rights." (Italics added.) (*Richardson* v. *Employers Liab. Assur. Corp.* (1972) 25 Cal.App.3d 232, 246 [102 Cal.Rptr. 547].)

■ Conceding as we have that respondent was entitled to an injunction, and compensatory damages, the question remains whether respondent is entitled to punitive damages unless there is a showing under case law of this state that appellants exercised their lawful rights with "callous disregard" of the rights of another or with the knowing intention to subject " . . . a person to cruel and unjust hardship in conscious disregard of his rights."

---

basis. *These elements resulting in damage are generally relied on as a basis for the assessment of punitive damage. Does every nuisance of the kind complained of automatically entitle the injured party to both compensatory and punitive damage? The line of distinction is not clear. Pragmatically it would appear that those who have been injured in the past by nuisances comparable in all respects to the one at bench have answered the question in the negative. This respondent at bench cites only one case of a comparable nuisance in which punitive damages were allowed. (*McIvor* v. *Mercer-Fraser Co.* (1946) 76 Cal.App.2d 247 [172 P.2d 758] [continuing excavation of dirt and gravel from a contiguous property in wilful violation of a city ordinance after continuous protest.]; cf. *Alonso* v. *Hills* (1950) 95 Cal.App.2d 778, 781 [214 P.2d 50].)*

[2] It seems logical to assume that when a legislative body enacts a zoning ordinance and other ordinances which require compliance with a building code that the legislative body has found as an indisputable fact that it is substantially certain that no substantial harm can ensue to an immediate neighbor of the actor or to the surrounding community. In fact, it has been so held. (See *San Francisco S. News Co.* v. *City of So. San Francisco* (9th Cir. 1934) 69 F.2d 879, cert. den., 293 U.S. 606 [79 L.Ed. 697, 55 S.Ct. 122].)

[3] Callous disregard of whether a legal act will harm another equates with a calculated intent to exercise a legal right irrespective of its consequences.

From the time the first formal protest was registered in respect of noise and pollution emanating from La Mancha on January 26, 1970, to the date of the permanent injunction, the record is rich with evidence of efforts and acts of appellants implicitly and sometimes expressly corroborated by respondent's admissions and conduct to remedy complaints of respondent on matters over which appellants had control and that appellants conscientiously exerted themselves to cure matters over which they had no control.

It is noted that the permanent injunction did not enjoin the operation of fans but regulated their operation. It ordered "keep locked or keep screens on all windows on the south side of" La Mancha unless a La Mancha tenant provided a doctor's written request to the contrary and that appellants ". . . conscientiously maintain and enforce its present system of security guards, house council, house counselors and the immediate processing of complaints of the neighbors." Appellants did all of those things voluntarily with the exceptions of the fan regulation as finally required, from the beginning of the operation of La Mancha. In respect of noise from fan operation and other sources, appellants had initiated research to curb fan noise within a few weeks after respondent registered his first written complaint.[4]

The permanent injunction, too, states that the fans were not at the time of its issuance a nuisance. There is no injunction of odors of unhealthy fumes, or trash disposal, and there is a recital that they do not constitute a nuisance. Likewise, there is no injunction in respect of the

---

[4]Ambient Noise. It will be recalled that the permanent injunction defined ambient noise as ". . . that noise level which exists at a time all noise making equipment . . . along the ground level . . . is not operating." There are pages of conflicting testimony of experts on whether the noise level exceeded the norm of five DBA's or seven DBA's fixed by the injunction and by how much. It is clear from the preponderance of the evidence that before the corrections were made that it was in excess of this amount.

One of respondent's experts testified that he had measured the noise in respondent's bedroom in 1969 and after the construction of the wall (referred to, *infra*). With the windows closed the noise level had been about 32 DBA's in respondent's bedroom; he testified that there had been some improvement in the noise level after the construction of the wall, but not enough. Another of respondent's experts testified that as the noise had been reduced from the fans a new 31-cycle tone had begun to be more prominent. This 31-cycle tone had not at first been noticeable but at the time of trial was creating a rumbling noise in the bedroom. This same expert, with consent of appellants and the court, conducted a demonstration in the court room. With all of the equipment off, no one talking and only the ceiling ventilators in operation, he measured a reading of 34 DBA. A 5 DBA penalty figure was added to the 34 because of a buzzing sound from the ceiling lights that had an irritating effect on the human ear. Appellants concurrently sought a similar test of the noise level in respondent's bedroom. Respondent's objection thereto was sustained.

loud noises of students or their guests, the parking of cars, and there is a finding that they "do not at the present time constitute a nuisance for which . . ." appellants are responsible.

The phrasing of the permanent injunction is eloquent testimony that appellants had initiated procedures in good faith to meet respondent's complaints even with respect to matters over which they had no control and in respect of which they had no responsibility. Since no motion to enforce sanctions under the permanent injunction were requested from the date of its issuance to the conclusion of trial on the damage phase, it is a fair assumption that appellants in good faith followed all its mandates. Further, under the terms of the permanent injunction, appellants on 72 hours notice from respondent were required to "completely shut off" "all noise making equipment upon the ground level" and cooperate in all respects to test the noise *if on the statement of respondent alone* the noise made by the machinery was unusually in excess of the ambient level. Respondent was empowered by the injunction to enforce such tests for a two-hour period once each calendar month, day or night, and appellants were ordered to cooperate. No tests were requested.

Respondent was graduated as an engineer and meticulously observed the construction of La Mancha from the commencement of excavation therefor. He admitted that most of the noise caused by fan operation was in the fall of 1969 during which time he made two oral complaints to employees of La Mancha. One of the employees testified without contradiction that in October of 1969 he received a complaint from respondent about noise of the exhaust fans and in reply he stated that a city ordinance required operation of the fans for 24 hours and that they could not be shut off. No other complaints were received about noise from the fans although they were on 24 hours a day until a letter dated January 26, 1970, was received by appellants which included complaints about noise, fumes and student conduct, stating that it was all injurious to respondent's health but no suggestion was made that Farmy was under care of a doctor or that he suffered from high blood pressure.[5] Appellants by reply letter dated February 5 stated that the windows had been locked and that La Mancha had no control over students parking in

[5]Respondent's personal physician testified that respondent's symptoms of high blood pressure began in 1968. (La Mancha operations commenced in October 1969.) Prosser at page 578 states: "It is not a nuisance to ring a church bell, merely because it throws a hypersensitive individual into convulsions . . . or to run a factory where the smoke aggravates the plaintiff's bronchitis . . . ." (Prosser, Law of Torts, (4th ed. 1971) § 87, p. 578.)

the Hilgard driveway. Respondent threatened litigation and on February 27 appellant requested detailed facts upon which respondent predicated his complaint and in reply received a letter stating that respondent would seek a temporary injunction at an early date and a copy of respondent's complaint.

During the brief correspondence above mentioned, respondent had complained to the city and specifically Councilman Edelman of his district generally about the nuisance and specifically the noise and had pointed out that the original plans called for installation of the kitchen fans on the roof. The kitchen fan as appears from the injunction was in no way enjoined by it except as the provisions of the injunction applied to all fans. Respondent was by letter of August 20, 1970, advised that the fan installation complied with the city code, but if he circulated a petition and obtained eight signatures the city could proceed to endeavor to cure his complaints by bringing an action to abate a public nuisance. No such petition was filed.

Concurrently, however, the city did serve notice on appellants. Appellants employed experts to investigate and advise whether the noise of its fans did so exceed the ambient level as to constitute a nuisance. A meeting between La Mancha representatives and city was held on March 24, 1970, 12 days after respondent's complaint was filed. The city agreed that appellants were not in violation of any laws or ordinances and so advised respondent. Respondent, however, filed no motion for a preliminary injunction until July 23, 1970. It was continued from time to time, heard, and argued on September 25, 1970. On October 21, 1970, the trial court by minute order requested preparation of a preliminary injunction limiting operating of certain fans between 8 p.m. and 8 a.m. and among other things granted a 60-day extension for the installation of silencers. The parties and the court, the trial court having in the interim viewed the premises, could not agree upon the language of a preliminary injunction and/or what should be specifically enjoined. A motion to modify a proposed preliminary injunction prepared as per a minute order of October 26, 1970, was periodically continued until the trial for a permanent injunction was commenced on July 27, 1971. A proposed permanent injunction was submitted on August 3, 1971. No permanent injunction was signed until January 14, 1972.

It is undisputed that appellants in operation of La Mancha did from the outset, in order to maintain discipline among students, maintain security guards, a house council and house counselors. Resident house

counselor testified that windows were locked on December 9, 1969; that students would pry them open and that in one instance an object was thrown from a window; three students were expelled for misconduct and it was also established that appellants brought three unlawful detainer actions against students and lost them.[6]

In the late summer of 1970 a time clock was installed on Fan No. II; in December 1970 muffler devices were installed on the fans. In April 1971 to enforce the policy of closed windows, the windows were locked. In May 1971 appellants built and completed a concrete block wall accoustically lined to reduce noise. In the process *respondent* enlisted the aid of city *to prevent* its construction. It was nevertheless completed. In June 1971 appellants offered to air-condition Hilgard; respondent refused.

Respectable authority, too, suggests that the injured party must take such prudent measures to avoid exacerbation of the damage which would in the circumstances complained of be taken by a reasonable man.[7]

In the late summer of 1971 additional mufflers were installed. On September 19, 1972, the windows were permanently sealed. The evidence in respect of trash pickups shows although there were such pickups for a short period as early as 5 a.m., the pickups originally started at approximately 9 a.m. and were restored to that hour before the motion for a preliminary injunction was originally heard.

[6]W.R. Locklear, associate dean of students, U.S.C., LA, in charge of housing, testified that methods used to cope with complaints about students in UCLA-run dormitories were similar to or identical with procedures used by La Mancha staff and that La Mancha management's approach to discipline was "hard nosed." The injunction implicitly recognizes as a matter of law that appellants had no vicarious responsibility for student misconduct (cf. *McGarvey* v. *Pacific Gas & Elec. Co.* (1971) 18 Cal.App.3d 555, 563 et seq. [95 Cal.Rptr. 894]) and there is no dispute as to the efforts continuously made by La Mancha to eliminate it.

[7]It is said in 58 Am.Jur.2d, page 698: "There is, however, considerable authority to the effect that failure to take steps to avoid the injury may be considered in mitigation of damages, where the jury finds that the injured person could have avoided it, and it has been held that in an action grounded upon nuisance wherein a plaintiff seeks to recover damages for an injury to his land or interference with the enjoyment and use thereof, resulting from either negligent or intentional acts of the defendant, the defendant cannot be held liable for subsequent occurring damage where the plaintiff, by a reasonable expenditure on his part, could have remedied the condition or protected his property or the enjoyable use thereof from further damage or interference, but failed to do so. *(Schiro* v. *Oriental Realty Co.* 272 Wis. 537, 76 N.W.2d 355, 73 ALR 2d 1368.)"

The foregoing efforts of appellants to cope with the elimination of complaints may have been ignored by the jury in making its determination on the subject of compensatory damages and for the purposes of this opinion we concede that the jury may rightfully have charged appellants with the consequences of the conduct they could not control, but should as reasonable men have anticipated, particularly since it was all admitted without objection, but we think that appellants' acts to control all causes of nuisance must be considered to make a determination on the question of malice or oppression.

Although it is settled that a person injured by a nuisance may have both an injunction and damages (Code Civ. Proc., § 731, subject to restrictions set forth in section 731a; *Pacific Western Oil Co.* v. *Bern Oil Co.* (1939) 13 Cal.2d 60, 66-67 [87 P.2d 1045].), it is not clear that even compensatory damages may be awarded after a permanent injunction has issued. *Polin* v. *Chung Cho* (1970) 8 Cal.App.3d 673, 678 [87 Cal.Rptr. 591], appears to hold[8] they may not when as here a permanent injunction has been obtained, but section 731 of the Code of Civil Procedure[9] on its face appears to state the contrary.

*Polin* does seem to indicate, however, that an injured party who has at his disposal a permanent injunction to prevent injury and fails to use it, concedes there is no irreparable injury and no callous disregard for the rights of another which warrant the assessment of any damages, or has acquiesed in a continuing trespass for which he hopes to collect the value of the use appropriated. (*Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 271 [288 P.2d 507].)

In every case involving a continuous nuisance mere proof thereof to the satisfaction of a court or jury by an act which on the part of the

---

[8]In *Polin* v. *Chung Cho*, 8 Cal.App.3d 673 [87 Cal.Rptr. 591], the court said at page 678: "Defendants assert that . . . seeking future damages indicates an election by plaintiffs to treat the trespass as permanent. But since plaintiffs seek an injunction against defendants, the future damages referred to must be construed to mean those occurring between the time of filing the action and the time of trial. (Civ. Code, § 3283.) If plaintiffs recover damages on the premise that the trespass is permanent, they will be 'deemed to have waived the invasion and consented to the continued occupancy of the land.' (*Slater* v. *Shell Oil Co.* (1943) 58 Cal.App.2d 864 [137 P.2d 713].) But if they obtain an injunction which will avert further damage, they are not entitled to damages beyond the date when the injunction is granted. (*Spaulding* v. *Cameron* (1952) 38 Cal.2d 265 [239 P.2d 625].)" (Cf. *Tracy* v. *Ferrera* 144 Cal.App.2d 827 [301 P.2d 905].)

[9]Code of Civil Procedure, section 731 says in pertinent part: "An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as the same is defined in section thirty-four hundred and seventy-nine of the Civil Code, and by the judgment in such action the nuisance may be enjoined or abated as well as damages recovered therefor."

offender has complexion of knowing harassment to the injured may be considered for the purpose of injunctive or compensatory relief, but unless the act is motivated by a "callous disregard" of whether the act will affect another or result in "cruel and unjust hardship" there is no oppression or malice.

Appellants had fully as much right to insist they were not maintaining a nuisance as did respondent who charged that they were. Wholly aside from the fact that appellants constructed La Mancha in compliance with the law and the implicit encouragement of city, the tenor of the permanent injunction demonstrated that the situation complained of required an adjustment of good faith rights claimed on both sides. In effect the permanent injunction established the law of the case by which court and jury were or should have been bound.

Although respondent advised appellants in March 1970 he would seek a temporary injunction, approximately two years passed before respondent obtained any injunctive relief. It thus appears he was not so greviously injured in person or property[10] to make immediate relief imperative[11] and that both sides were proceeding in good faith either to settle the damage facet of respondent's claim and/or to reach a restrictive operational agreement each side could live with. The fact that the parties did not and could not adjust the matter between themselves, but depended upon a formal equity adjustment by permanent injunction is not proof of malice on either side. It is difficult for a court to assume that respondent who shows himself to be knowledgeable,[12] represented by competent counsel, would allow two years to elapse before obtaining any injunctive relief in a situation which he asserts was so grevious to him personally, and so damaging to his property, if he were not satisfied in his own mind that appellants, too, had some rights.

On October 12,. 1972, before trial, appellants made a motion in chambers for an order to exclude the issue of punitive damages. It was denied. Upon conclusion of respondent's case, appellants moved for a directed verdict on the issue of punitive damages. It was denied. Appellant's request that no instructions be given on punitive damages was ignored.

---

[10] Respondent made no attempt to prove that Hilgard had depreciated in value.

[11] Although respondent had, by his own admission, examined the plans of La Mancha and had specific facts upon which he bases his complaint and predicates his damages as early as January 26, 1970, he made no attempt to get an ex parte restraining order.

[12] The record also shows that respondent had brought a prior action against appellants and others in respect of claimed damage to Hilgard caused by the excavation work for La Mancha.

Nothing in the evidence supports an instruction for or an award of punitive damages. ■ Respondent introduced evidence of appellants' wealth before the jury which indicated a substantial investment in La Mancha and also showed the gross annual income of La Mancha and its probable net profits. Objection by appellants thereto would in view of the court's denial of appellants' motion have been futile, would have been tactically self-defeating and would have emphasized its relevance and importance. In the circumstances it was unnecessary. The trial court had ruled and respondent and the trial court were aware of appellants' position from the beginning of the trial.

It is trite law that in the ordinary tort action for damages evidence of wealth or other source of income of either party engaged in the lawsuit, when prejudicial, is reversible. At bench the evidence above recited was prejudicial and in our opinion tainted the award for compensatory damages. (*Hrnjak* v. *Graymar, Inc.* (1971) 4 Cal.3d 725 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224] [collateral source]; *Menefee* v. *Williams* (1968) 259 Cal.App.2d 56 [66 Cal.Rptr. 108] [insurance coverage generally]; *Mahnkey* v. *Bolger* (1950) 98 Cal.App.2d 628, 636 [220 P.2d 824] [insurance coverage].)

The judgment appealed from is reversed. On the issue of punitive damages, the trial court is directed to modify the judgment and to enter judgment on the subject of punitive damages for appellants. In respect of compensatory damages, a retrial shall be had. Costs to appellants.

Fleming, J., and Beach, J., concurred.

A petition for a rehearing was denied June 11, 1975. Beach, J., was of the opinion that the petition should be granted as to issues other than punitive damages. Respondent's petition for hearing by the Supreme Court was denied July 16, 1975.